THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. FREDERICK K. BUCKMINSTER, Plaintiff in Error.

*Opinion filed June 22, 1916—Rehearing denied October 11, 1916.*

1. CRIMINAL LAW—*confession is said to be involuntary if made through hope or fear.* Although there is no fixed rule for determining whether a confession is voluntary or involuntary and each case must depend upon its own facts, yet the test in every case is whether the confession is or is not an influenced statement, and a confession is said to be involuntary if made through hope or fear.

2. SAME—*confession not freely made is not admissible in chief.* A confession not freely and voluntarily made is not admissible in evidence as part of the case in chief against the party making it, but the authorities are not in accord as to whether it may be admitted for the purpose of impeaching the testimony of the party making the statement after he has testified in his own behalf.

3. SAME—*when it is prejudicial error to admit confession of co-defendant.* It is prejudicial error in a criminal case to admit in evidence an involuntary confession of a co-defendant for the alleged purpose of impeaching such co-defendant's testimony, where the confession contains statements very damaging to the other defendant, particularly where the portion implicating him could have been excluded without affecting the impeaching force of the confession; and this is true although the jury were instructed to consider the confession with reference to the party making it, alone.

4. SAME—*general rule as to admission of confession of a co-defendant.* As a general rule a confession made by one person after the commission of a crime cannot be admitted against a co-defendant unless made in the presence of the co-defendant and assented to by him, and if admitted, on a joint trial, against the party making it, all reference to the other defendant should be excluded from the confession, if possible, and the effect of the confession be limited, by instructions, to the party making it, or else the defendants should be given separate trials.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. ROBERT E. TURNEY, Judge, presiding.

BENJAMIN C. BACHRACH, for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, GEORGE P. RAMSEY, FRANK JOHNSTON, JR., and W. W. DEARMOND, for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, Frederick K. Buckminster, was indicted, jointly with Morris Friedman and Benjamin Fink, for arson, at the February term, 1913, of the criminal court of Cook county. He was tried jointly with Benjamin Fink and both were found guilty by the jury in December, 1915. Judgment was entered on the verdict as to Buckminster and he was sentenced to the penitentiary. Friedman was tried separately. Fink, at the time this writ of error was sued out, was awaiting a decision on his motion for a new trial.

In May, 1911, a five-story building owned by Samuel Tolman, at the foot of Orleans street, near the north branch of the Chicago river, was occupied on the ground floor by the Davidson Bros. Marble Company. Most of the second, third and fourth floors was occupied by the Northwestern Can Company. Between two and three o'clock on Monday morning, May 22, a fire occurred in the building, spreading rapidly through the entire structure. The firemen arrived soon after the fire started, but though working for hours were unable to extinguish it before the building was practically in ruins. Buckminster was secretary and a stockholder in the Northwestern Can Company. George Harris testified for the State that he had been salesman for that company, and that Buckminster told him about three weeks before the fire that he was going to have the building burned and that Fink was going to do it. He testified that he heard a conversation between Friedman and Buckminster when the fire was discussed. He stated that he had been told by Buckminster to receive three barrels containing paint, which would be sent to the company's plant, and that the barrels were brought there late on the Saturday afternoon before the fire. Israel Schaffner testified that Fink came to his home on Sunday before the fire and persuaded him to go to the can company's plant that evening; that after eight o'clock they went in, opened the barrels and

poured gasoline around on the second and third floors and set fire to it just before they left. A police officer who had been with Fink for several months while the latter was under surveillance testified that Fink stated that he had set this fire. At the time of the fire the can company was moving its business to Brazil, Indiana, having already shipped some of its machinery. About a week after the fire Harris and Buckminster worked in the ruins on Sunday a long time to reach the safe and opened it, taking therefrom certain insurance policies. The total insurance on the plant at that time was $30,000, of which $13,500 had been placed within two weeks before the fire. This, however, was not all additional insurance, policies amounting to $9500 having lapsed only a month or two before. The insurance agent testified Buckminster talked with him over the telephone, about a week before the fire, as to placing $20,000 or $30,000 on the can company's plant. The evidence tends to show that the customary amount of insurance on this plant was between $30,000 and $40,000. Soon after the fire Harris went to Toronto, Canada, and testified that he did so because there was so much talk about the barrels having been found in the building after the fire. He stated that after he returned Buckminster told him to keep under cover. Buckminster went to Canada also after the fire and began working there under an assumed name. He testified that he had assumed another name because he was working as a detective on a case. He denied making the statements to Harris about the fire, testified to by the latter, and also denied that he had anything to do with burning the plant or causing it to be burned.

The record shows that previous to this trial Fink had confessed to assistant State's attorney Johnston of Cook county that he had been actively connected with burning from seven to ten different buildings in Chicago, and that he had testified to that effect in other trials, implicating various people as having taken part in setting fire to these

several buildings, and that because of his agreement so to
testify he had been promised immunity from punishment
for his part therein. As a part of this confession, which
was taken down in shorthand by a stenographer, the assist-
ant State's attorney testified that Fink confessed to helping
set this fire. On this trial the State attempted to introduce
this part of his confession against him while putting in its
proof of the case in chief. On objection by his counsel that
the confession was not voluntary it was not allowed in at
that time. On this trial Fink had different counsel from
counsel for plaintiff in error. In his own defense Fink's
attorney placed him on the stand as a witness. He testi-
fied that he had never made any confession to the assistant
State's attorney in which he had stated that he had had any
part in setting fire to the plant of the Northwestern Can
Company and denied that he had any part in setting it. To
impeach him the court permitted the State to introduce that
part of his alleged confession to the assistant State's attor-
ney which pertained to the Northwestern Can Company's
fire. This was objected to by the attorney for plaintiff
in error, especially that part of it which connected Buck-
minster with the fire. The trial court admitted the entire
confession as to this fire in evidence. A portion of the
confession is as follows:

"Statement of Benjamin Fink made before Frank John-
ston, Jr., this first day of December, A. D. 1914, in the mat-
ter of the Northwestern Can Company fire, which occurred
on May 22, 1911, at about 2:35 A. M., at the foot of Or-
leans street:

"Mr. Johnston:

Q. "What is your name?

A. "Ben Fink.

Q. "You are now in the custody of an officer from the
State's attorney's office, are you not?

A. "Yes, sir.

Q. "You are the same Ben Fink that heretofore has made a statement in regard to a number of fires?

A. "Yes, sir.

Q. "You recall the Northwestern Can Company fire, which occurred on May 22, 1911?

A. "Yes, sir.

Q. "Did you make that fire?

A. "Yes, sir.

Q. "Did anybody else help you?

A. "Jake Schaffner.

Q. "Now, state as fully as you can remember, what person or persons of the Northwestern Can Company you talked to about it.

A. "I talked to Mr. Buckminster.

Q. "About how long before?

A. "About six weeks before.

Q. "How did you happen to meet Mr. Buckminster?

A. "I used to work there, and I know him personally.

Q. "Did he approach you?

A. "Yes, sir.

Q. "What did he say?

A. "Well, he wanted—they were moving, and he lost money in that business, and he said he would like to get the place burned out before he moved everything out. He was going down to Brazil, Indiana. The whole thing was fixed up by Nathan Spira. He was the whole thing in that. He paid the money and everything. Spira saw me about it and got me to make it. Spira was there the same evening.

Q. "Where did you have your first conversation with Buckminster?

A. "I think I had it at the Illinois Athletic Club.

Q. "Did you agree with him on a price?

A. "Yes, sir; $2000.

Q. "He was to pay you $2000?

A. "Yes sir; for the whole thing.

Q. "How were the payments to be made?

A. "I was supposed to get all.

Q. "Before the fire?

A. "No, after.  I got the money two months or six weeks after the fire.  He gave it to Spira and Spira turned it over to me.

Q. "Did you make the agreement with Buckminster?

A. "Yes, sir.

Q. "Did Spira give you the whole $2000?

A. "No, he gave Schaffner what was coming to him and gave me the balance.

Q. "How much did Schaffner get?

A. "Five hundred dollars, I think.

Q. "What did you use?

A. "Gasoline and benzine.

Q. "How much?

A. "Two barrels.

Q. "How many gallons?

A. "Fifty-five gallons in each barrel.

Q. "Who bought the gasoline?

A. "They arranged for all that—everything.

Q. "What did George Harris have to do with it?

A. "I don't know.

Q. "What particular connection did Harris have?

A. "He was an inside man.  I don't know anything about that.

Q. "Did—do you know whether he arranged for the gasoline?

A. "Maybe he did.

Q. "He showed you where the gasoline was?

A. "Spira told me it would be on the first floor, and I found it there.

Q. "How many floors did you put gasoline on?

A. "Two floors.

Q. "Did you use any excelsior?

A. "Excelsior—about eight or ten bales of it, maybe more.

Q. "Jake Schaffner helped you spread it?

A. "Yes, sir.

Q. "Helped you pour the gasoline?

A. "Yes, sir.

Q. "Did you break the barrels after, or leave them there?

A. "Yes, we left them there.

Q. "Who gave you the key to the place?

A. "Spira.

Q. "And you took Jake with you?

A. "Yes, sir.

Q. "How long after the fire was it that you were paid?

A. "About six weeks.

Q. "Did Feilschmidt have anything to do with it?

A. "Not directly.  He knew about the case, that's all.

Q. "Did you ever see Friedman?

A. "No.

Q. "You only saw Buckminster?

A. "Yes, sir; only Buckminster.

Q. "You know further details in connection with the fire, do you not?

A. "Well, not much.

Q. "Well, you haven't made a full statement here of the facts and circumstances surrounding the fire, have you?

A. "Not yet.

Q. "You will make a fuller statement later on?

A. "Yes, sir; later on, when I get my head clear as to it.  * * *

Q. "During the trial of the Fox-Felsenthal case before Judge Brentano, did Max Feilschmidt give you any money?

A. "Yes, he gave me $200.

Q. "Did he give it to you at the Bradley Hotel?

A. "Yes, sir; in the room.

Q. "At what time of the day?

A. "About two o'clock in the afternoon.

Q. "Did he tell you what to say about the back stairway?

A. "There was a stairway in the rear.

Q. "Did he tell you to say that you told Moe Rosenberg that if he did not pay you the money you would go to Fox for it, and that Rosenberg replied that Fox did not know anything about it and would have you arrested?

A. "Yes, sir.

Q. "And he gave you this money hurriedly and left?

A. "Yes, sir."

The circuit court instructed the jury to disregard this confession so far as it affected Buckminster. The only error relied on is the admission of this confession in evidence. Counsel for plaintiff in error insists that none of this confession was admissible either against Fink or Buckminster, and, in any event, that part of it which referred to Buckminster, under the facts in this case, should not have been admitted over Buckminster's objection. The authorities all hold that a voluntary confession is admissible in evidence against the person who made it. A confession is said to be involuntary if made through hope or fear. There is no fixed rule as to what will constitute a voluntary or an involuntary confession. Each case must depend on its own facts, the test being in every case whether the confession was or was not an uninfluenced statement by the party making it. (3 Ency. of Evidence, 304.) The authorities in this country are practically a unit in holding that a confession not freely and voluntarily made cannot be admitted in evidence. (1 Greenleaf on Evidence,—Lewis' ed.—sec. 219; 1 R. C. L. 552; *Gates* v. *People,* 14 Ill. 433; *Miller* v. *People,* 39 id. 457; *Robinson* v. *People,* 159 id. 115; *Lauderdale* v. *State,* 31 Tex. Crim. 46; Archbold's Crim. Pr. & Pl.—24th ed.—391, 392; 2 Wharton's Crim. Evidence, sec. 622e; *Harrold* v. *Oklahoma,* 17 Ann. Cas. 868, and note.) There can be no question under the authorities, on the proof in this record, that Fink's confession must be

classed as involuntary and not admissible as against him when the State offered it as a part of its case in chief. The State, however, insists that it was admissible to impeach Fink's testimony, as he voluntarily took the witness stand to testify in his own behalf. This question has not been passed on in this court. The authorities in other jurisdictions are in conflict as to whether an improper or involuntary confession is admissible in evidence, not as a confession, but to impeach the testimony of the person who made it. (1 R. C. L. 575.) In some jurisdictions it is held admissible for impeachment purposes, only, after the person who made it has testified in his own behalf, where proper foundation is made, on the ground that a defendant in a criminal case, by exercising the privilege given him by statute of testifying, thereby waives the constitutional right to protection against compulsion to give evidence against himself and becomes subject to cross-examination and impeachment as any other witness. In other jurisdictions an involuntary confession of an accused person incompetent to be admitted in the case on behalf of the State in chief is held to be incompetent to impeach the accused after he has testified in his own behalf relative to other subjects, on the ground that such confession is unworthy of belief and its introduction would violate the constitutional guaranty that the accused shall not be compelled to testify against himself. It is held by these authorities that the chief object of the State in introducing such a confession is, in reality, to get it in evidence; that though it cannot be done directly this would permit it to be done indirectly; that while it cannot be used to convict the accused it could then be used to contradict him, and in that way practically be used to convict him, just as if it had been introduced by the State in chief. This line of cases holds that such a confession is inadmissible, even though the court instructs the jury that it can only be considered by them for the purpose of impeaching the testimony of the defendant and cannot be

used as evidence to convict him. These authorities are reviewed at length in *Harrold* v. *Oklahoma, supra.* In view of the conclusions we have reached on another branch of this case we find it unnecessary to decide this point here.

Even if it be assumed that the confession could be admitted against Fink for the purpose of impeaching him if he were being tried alone, we do not think that part of his confession which affected Buckminster, in view of the record before us, should have been admitted for any purpose when Buckminster was on trial jointly with Fink. It has long been the settled rule of law that the voluntary confession of one person made after the commission of the crime cannot be admitted against a co-defendant unless made in the presence of the co-defendant and assented to by him. (1 R. C. L. 520; 12 Cyc. 440; 2 Wharton's Crim. Evidence,—10th ed.—secs. 699, 700.) But if co-defendants are tried together, the usual rule has been to hold that such confession can be admitted against the one who made it, with instructions by the court to the jury that it is only admitted against that one defendant, and is not to be considered as evidence against his co-defendant. (1 R. C. L. 574, and cited cases; 6 Am. & Eng. Ency. of Law,—2d ed.— 572.) The wisdom of this rule has been questioned more than once. In some of the earlier English cases the judges ruled that the confession, when admitted, should not contain the name of the other prisoner implicated thereby, (Archbold's Crim. Pr. & Pl.—Waterman's 7th ed.—409,) and it has sometimes been stated that it was impossible not to feel that such a confession, even though limited by instructions to apply only to one defendant, must inevitably have its effect upon the minds of the jury as to the other defendant. (*Rex* v. *Martin,* 4 Ann. Cas. 912.) In the opinions in that case, and the note attached thereto, the authorities on this question are reviewed. To obviate the evils arising from the possibility of the jury being misled by such confessions against the co-defendant, the rule is general that where one

of several defendants jointly indicted has made admissions or confessions implicating others, a severance should be ordered unless the attorney for the State declares that such admissions or confessions will not be offered in evidence on the trial. (19 Ency. of Pl. & Pr. 528; Wharton's Crim. Pl. & Pr.—9th ed.—sec. 310; 1 Bishop's Crim. Proc.— 3d ed.—sec. 1019*a.*) Some of the cases have stated that, on the plainest principles of justice, if the prosecutor intends to use such confession the prisoners should be tried separately. (*Queen* v. *Weir,* 3 Can. Crim. Cas. 351; *Rex* v. *Martin, supra.*) It is very clear from all the authorities that the courts have realized the evils of admitting confessions on behalf of one defendant that implicated a co-defendant, even though limited by the trial court to the person who made the confession, and have only permitted such a confession to be admitted, when two were being tried jointly, because there seemed no practical way of reaching a right result, under the law, as to the person who made the confession, without admitting it; that the injury as to the co-defendant might be less than the evil that would arise in the enforcement of the criminal law if the confession were shut out entirely. Indeed, the opinions in *Rex* v. *Martin, supra,* indicate that the judges there might not have held that such a confession was competent for any purpose when it implicated a co-defendant, if they had not thought it was the settled law under former decisions.

If the part of the confession that pertains to the guilt of the co-defendant can be properly left out without in any way weakening the confession as to the one who made it, we can conceive of no reason why the court should not rule that only that part of the confession be admitted that does not in any way implicate the co-defendant. While the point has never been passed upon directly by this court, when the question was necessary for the decision of the case, it has been plainly intimated in two cases that this ought to be done even as to voluntary confessions. In *People* v. *Ander-*

*son,* 239 Ill. 168, the court said (p. 180) : "No man can confess for anyone but himself. As above indicated, however, each statement contained admissions of fact which the jury might rightfully regard as tending to show the guilt of the man making the statement. If there was in either statement anything the effect of which was to indicate the guilt of Anderson without tending to show the guilt of the man making the statement, that part of the statement was not properly admissible in this case, where Anderson was on trial." Again, in *McCann* v. *People,* 226 Ill. 562, the court said (p. 569) : "In the first part of the written statement of Philip McEwen he admitted he was present in the afternoon and evening on the occasion of the shooting. The objection of the plaintiff in error to the admission of said statement went to the entire statement, and not to that part, only, which tended to incriminate the plaintiff in error. Had the objection been limited to the part of the statement which tended to incriminate the plaintiff in error the objection would doubtless have been sustained."

The authorities have frequently stated that voluntary confessions should be closely scrutinized, and it is generally held that they must be corroborated in order to sustain a conviction. (2 Wharton's Crim. Evidence,—10th ed.— sec. 635; 1 Wigmore on Evidence, 866; *Bergen* v. *People,* 17 Ill. 426; *South* v. *People,* 98 id. 261; *Campbell* v. *People,* 159 id. 9; *Brown* v. *People,* 91 id. 506.) If this be the rule as to the character and weight of voluntary confessions when admitted against the person who made them, there is surely much more reason to place about the admission of an involuntary confession which affects a person in no way responsible for it, every safeguard possible under a due and proper administration of the law, and such a confession certainly should not be admitted, so far as it affects the guilt or innocence of a third party, if justice can be otherwise administered.

Our attention has not been called to any case in the briefs, and we know of none, where this precise question, under the circumstances shown in this record, has been passed upon, but on reason and by the application of the principles that have become settled law by other decisions, we cannot see why the criminal law cannot be more justly and wisely enforced by holding that the part of the confession which affected Buckminster should have been refused admission. The reading of this confession admitted in evidence shows clearly that Fink had confessed his own guilt before he said anything as to Buckminster being connected with the crime. The trial court should have sustained plaintiff in error's objection to admitting that part of the confession that connected him in any way with causing the fire.

Counsel for the State argue that even though this evidence was improperly admitted, the guilt of plaintiff in error is so clearly shown by other evidence properly in the record that the admission of the confession, when by an instruction of the court it was strictly limited in its effect to Fink, could not injuriously have affected plaintiff in error. With this we cannot agree. The admission of improper testimony that would have a tendency to warp or prejudice the minds of the jury can hardly be considered harmless on this record. This confession was highly prejudicial to plaintiff in error. It would be impossible to decide with any certainty as to whether it would or would not unconsciously affect the jury as to their verdict. If from the legal evidence admitted they had any doubt as to the guilt of plaintiff in error, the jury would not find it easy, or perhaps possible, to remove from their minds the impression produced by this confession. If the jury believed, from the evidence, that Fink was guilty of setting other fires and had so confessed to the State's attorney, and had testified to that effect in the trials as to other fires, it would be quite natural that they should disbelieve his testimony that he (Fink) had nothing to do with this fire. It would almost

certainly follow that they would think that if he had testified falsely as to his having had any part in this fire they would also disbelieve his testimony that Buckminster had had nothing to do with it. Testimony improperly admitted, no more injurious, has been held reversible error in numerous cases. (*State* v. *Sprague,* 64 N. J. L. 419; *People* v. *Loper,* 23 Ann. Cas. (Cal.) 1193; 15 S. Dak. 580; *Pryor* v. *State,* 40 Tex. Crim. 643; *State* v. *Weasel,* 30 La. Ann. 919; *Browning* v. *State,* 30 Miss. 656; *People* v. *Conrow,* 200 N. Y. 356; *Foster* v. *Shepherd,* 258 Ill. 164.) It would be difficult to imagine any evidence that would be more prejudicial to plaintiff in error than this confession by a co-defendant that plaintiff in error had hired him to set this fire.

The judgment of the criminal court will be reversed and the cause remanded.      *Reversed and remanded.*