(No. 61679.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ALEJANDRO HERNANDEZ, Appellant.

*Opinion filed January 19, 1988.—Rehearing
denied April 5, 1988.*

CUNNINGHAM, J., took no part.

Charles M. Schiedel, Deputy Defender, and Lawrence J. Essig, Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart and Shawn W. Denney, Solicitors General, and Mark L. Rotert, Scott Graham and Terence M. Madsen, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE SIMON delivered the opinion of the court:

Ten-year-old Jeanine Nicarico was abducted from her home in Naperville on Friday, February 25, 1983; she was raped and murdered the same day. On March 6, 1984, the defendant, Alejandro (Alex) Hernandez, and two codefendants were indicted on charges of murder, residential burglary, home invasion, aggravated kidnapping, aggravated indecent liberties, deviate sexual assault, and rape, and they were tried together. The defendant and Rolando Cruz were convicted on all counts (except home invasion, which was nol-prossed on the State's motion) following a jury trial in the circuit court of Du Page County. The jury was unable to reach a verdict on identical charges against the second codefendant, Stephen Buckley. The defendant waived his jury right for purposes of the death penalty hearing, and a death sentence was imposed by the circuit judge. Execution of sentence has been stayed (87 Ill. 2d R. 609(a)) pending disposition of this direct appeal. Ill. Const. 1970, art. VI, §4(b); 87 Ill. 2d R. 603.

I

The victim was home alone on the day of the crime because she had not been feeling well. Patricia Nicarico, the victim's mother, worked nearby, and she came home around noon to fix lunch, returning to work half an hour

later. Patricia Nicarico last spoke with her daughter by telephone at about 1 p.m.; they discussed a television program the victim had been watching and whether Jeanine should write a letter to her grandparents. Two hours later, Kathy Nicarico, one of the victim's two older sisters, arrived home from school. She testified that the front door was ajar, the striker plate was on the ground and the molding from inside the door frame was almost totally torn off. Entering the house, she noticed that the television was on, but she could not find the victim. A partially written letter to the victim's grandparents was found in front of the television. According to the testimony of Kathy and her mother, there were signs of a struggle in the older sisters' bedroom; a blanket and top sheet were missing from Kathy's bed. Nothing else had been stolen although a television, video cassette recorder, jewelry box, and several articles made of silver were all in plain view.

Investigating officers testified regarding their examination of the Nicarico home. Fingerprints were lifted from inside the house, and a boot print was discovered on the front door just below and left of the latch. Two shoe prints, each with a different tread design, were found outside the living-room window. A fourth print was found inside a depression on the Nicarico lawn where a car tire had apparently ridden up over the curb and left an imprint. Two dogs and their handlers were brought in from the Lake County sheriff's police, and the handlers testified that their dogs tracked Jeanine's most recent scent from the front door, part way down the driveway, across the lawn and to the curb about eight feet from the tire track on the lawn.

Jeanine Nicarico's body was found two days later, in heavy underbrush approximately 45 feet off a hiking trail, known as the Illinois Prairie Path, between Eola Road and the East-West Tollway in Du Page County.

That portion of the Prairie Path ends where it intersects the Tollway approximately 1,500 feet north of where the victim's body was discovered. Investigating officers testified that the body was found lying face down on a slight incline. Approximately two feet up and to the left of her head there was a small, "head shaped" depression in the mud; blood was found in that depression. A small quantity of leaves and mud were adhered to the back of the victim's head, and the left side of her body was muddy. Her eyes were covered with a piece of towel which had been taped firmly to her head, and she was found wearing only her nightshirt, torn from the hem to the right armpit and pulled up over her shoulders. Patricia Nicarico testified that the victim had been wearing underwear, but her underwear—like the blanket and top sheet from Kathy's bed—was never found.

Dr. Frank Cleveland, the coroner of Hamilton County, Ohio, conducted a post-mortem examination. He testified that the victim died from at least five extraordinarily powerful blows delivered to the front and back of her head by a blunt instrument; each injury to the back of her head was characterized by a large laceration that became V-shaped at one end. All of the blows were delivered within a limited span of time, and each individually would have been fatal. The victim also suffered a broken nose, split upper lip and severely bruised lower lip, and there was a small bruise on her left shoulder. She had abrasions on the upper back sides of her legs which were inflicted either after her death or very shortly before as blood was redirected in reaction to her head injuries.

The autopsy revealed evidence that the victim had been raped and anally assaulted before her death, but a toxicologist from the Illinois Department of Toxicology testified that too little semen was recovered from the victim's body to be of evidentiary value. The Chief Toxicologist of the Illinois Department of Public Health testi-

fied that he examined the victim's stomach contents and determined that she died two to four hours after eating. Dr. Cleveland agreed with that judgment. Because the food in her stomach was consistent with what the victim's mother had prepared for her lunch on February 25, the evidence indicates that the victim was abducted, raped and murdered all within a span of one to three hours between 1 and 4 p.m. that day.

There were no witnesses to any of the crimes perpetrated against the victim, but two prosecution witnesses gave evidence as to their observations of events occurring on February 25 which might have been connected to the crimes. Joan Johanville had lunch with her husband at the couple's upholstery business, located in a garage next door to the Nicarico home. She left her husband at about 10 or 12 minutes past 1 p.m. to drive home, and just past the Nicarico home she had to bring her car almost to a stop to avoid colliding with a car driving down the center of the street in the opposite direction. Johanville described the car as an older, light-blue or white car with a great deal of rust on the lower body. She also testified that the only person she saw in the car was its driver and that she remembered his face for his "very creepy and scary" eyes.

At trial, Johanville identified Buckley as the driver. However, she described the driver to police and FBI agents shortly after the incident, and her description was of a man with no facial hair and wearing wire-rimmed "granny" glasses. It is undisputed that Buckley has never worn eyeglasses and that he had a mustache, wide ("mutton chop") sideburns reaching down to his mustache, and hair nearly down to his shoulders at the time. Nonetheless, Johanville was certain of her identification, explaining that she might have "transposed" the glasses onto Buckley's face from the face of someone she knew and who resembled Buckley.

Frank Kochanny, a highway maintenance engineer for the Illinois Tollway Authority, testified for the State. He said that he and a fellow worker were picking up trash alongside the east-bound lanes of the East-West Tollway between 2:45 and 3 p.m. when they saw a car driving parallel to the Tollway just south of the boundary fence. It was driving in an area west of Eola Road, near a "Coldwell Banker" billboard. The Prairie Path meets the south side of the Tollway west of Eola Road, and at the time a "Coldwell Banker" advertisement was located just west of where the Path intersects the Tollway. Kochanny testified that the car was driving west at roughly 10 miles per hour, and that approximately 20 to 25 feet from the sign the car did a three-point turn, heading back to the east at a relatively faster speed. When Kochanny stepped out of his truck for a better look, the car had disappeared. Kochanny described the car he had seen as a 1978 or 1979 green Ford Granada with a hubcap missing from the front driver's side wheel. He saw a single individual in the car, a white male with dark sunglasses and hair midway down his ears or shorter.

Dean Schmunk testified that he spotted a green, four-door Ford Granada on March 8, 1983, with a hubcap missing off the front right wheel; he noticed it because police had said they were looking for such a car in connection with the Nicarico case. Schmunk had only a brief look at the driver, but he testified that he recognized Buckley as the driver of the car when he saw Buckley's picture in the newspaper the following March. There is, however, no evidence that either Buckley or any of his family or friends owned a green Ford Granada. Nor did investigators discover any reported thefts of such a car during the time at issue.

The only evidence presented against the defendant consisted of his pretrial oral statements; there is no physical or eyewitness evidence linking him to the

crimes. The first of those statements testified to at trial was made by the defendant to his mother, Haydee Hernandez, within two weeks of the victim's death. Haydee testified that her son asked for her advice on what to do having heard a conversation in which someone he claimed not to know admitted his involvement in a murder. Haydee testified:

"He [the defendant] said, 'Well, I was going down to passing the Jewel supermarket and I be invited by some friends to, if I want to drink a beer with them[,'] and he said, 'Yes.' He get inside of the car and they was drinking beer, somebody in the car said, 'I don't want to kill—I don't want to kill her.'

\*\*\*

And I told him [the defendant], 'But what you mean? What he mean?'

He said, 'I don't know.'

That's what he said, 'He don't want to kill her but he killed her because she started screaming.'

\*\*\*

I told him, if he knows, the guy.

And he [the defendant] said, 'Well, I don't know him but he is a friend of, you know, the people that invite him to drink the beer with him.' "

On his mother's urging, the defendant spoke to his uncle, Wilfredo Estremera. Estremera testified that the defendant was riding in his car and they had just heard a radio news story about the case when the defendant said: " 'Uncle, you know what? I know the guy that killed the little girl in Naperville.' " According to Estremera, "I asked him for a name, if he knew the guy's name and he said, 'The guy's name was Ricky.' " The defendant said he did not know Ricky's last name, but he told Estremera that Ricky "is a white boy [who] hangs out in Aurora, and he is from Oswego." According to Estremera's testimony, the defendant related that "they were sitting one day in his friend's car and that

his friend was drunk and he was high and he just came out and told [the defendant] he had killed the little girl."

The defendant also told Estremera that he did not want to call the police because he was afraid of getting killed; he said that the person responsible for the victim's death had also committed a crime in Aurora known as the "Frosty Mug" murder. Estremera told a co-worker, however, and the co-worker contacted the FBI. Tracing the call back to the co-worker and Estremera, Du Page investigators eventually contacted the defendant on March 10, 1983.

When contacted on that date by Du Page County sheriff's police detective John Sam, the defendant agreed to be interviewed but at first denied any knowledge of the crimes. After 10 or 15 minutes, he related that he was sitting in a car with Stephen Buckley, Mike Castro and a third man, who was telling a story of how he had killed a girl in Naperville. The defendant referred to the confessing man first as Ricky from Oswego and later in the conversation as Ricky Benevides.

Special Agent Jeff Boggan of the FBI testified that on March 16 he was present when the defendant made a statement recounting "Ricky's" participation. The defendant said he was sitting in Ricky's car drinking beer with Mike Castro, Stephen Buckley and Ricky, whose last name he said he did not know. During the conversation the defendant suggested that they all go to the junior high school and "look at the women." Ricky said he did not want to go, and then he added that he had not meant to "kill that bitch." The defendant told Agent Boggan that Ricky carried a nightstick in the trunk of his car.

Investigating officers arranged for the defendant to meet a friend of his, Armindo Marquez, Jr., who was incarcerated in the Kane County jail on charges of residential burglary. Marquez testified that he brought up the

subject of the Nicarico murder after a few minutes of casual conversation with the defendant, at which point the defendant made the following admissions:

"He [the defendant] said that—he said his partner drags the girl out of the house by her ankles. *** He said he had dropped his partner off, went around the block once and pulled up in the driveway, that's when he saw him pulling this girl out by her ankles."

Marquez testified that the defendant had said he noticed the Nicarico's black nightlight and that it bothered him, though he did not know why. The victim's father testified that a nightlight like the one Marquez said the defendant described to him was located in front of the house. Marquez also testified that the defendant at first claimed that some diamond rings were stolen from the Nicarico home during the abduction, but the defendant later contradicted himself and said no property had been taken.

The defendant told Marquez, according to the latter's testimony, that they took the victim to an abandoned house and killed her because she was making too much noise. "So then he [the defendant]—he used something to tie her eyes with and then he held her and the other guy hit her" with a club or bat. After that, "[s]he was dumped and stomped on the back of her head." Du Page and Kane County officers took the defendant and Marquez in search of the abandoned house on two separate occasions, but it was never found.

Marquez testified that in his presence the defendant identified a picture of Ricky Byrnes as the subject of his "Ricky" statements. After the officer displaying that photograph left, the defendant told Marquez that Byrnes was not really involved. According to Marquez, the defendant first said he did not know the perpetrators' real names. The defendant later said he did, but that if he revealed their names he would be shot.

Jackie Estremera, the defendant's cousin, testified that he had a conversation with the defendant in October 1983 in which the defendant claimed to have participated in the crime. Jackie Estremera testified:

"He was telling me, he said he knew who did it, the person that did it was in Kane County or he was telling me that the person that did it was in California or he was the driver or another person was the driver. He was just confused, that's all."

Jackie Estremera testified that the defendant told him that they had planned to burglarize the home, and that the defendant drove.

"They went out, he says he never came out of the car, they went up, they went to the house and—

\* \* \*

Well, they knocked the door down, they kicked it in. He heard, he said he heard—he had heard it from his friend and then he said the person who did it was in California. \* \* \*

Q. [PROSECUTOR] And what, if anything, do you recall at that time, Alex Hernandez telling you as to why they took the little girl?

A. Yes, because she—they didn't want her, the little girl, to recognize them if they were taking her down to the police station and showed pictures."

Jackie testified that the defendant asserted "he wasn't going to say nothing unless he got [reward] money."

While in the custody of Du Page County sheriff's police on June 6, 1984, the defendant made a statement to Lt. Robert Winkler, watch commander at the Du Page Correctional Center, in which he said that he and two other individuals planned to burglarize a house in Naperville. They drove to the house in a late model dark-green Lincoln Continental, but the defendant lost his nerve on the way and was let out of the car three blocks from the Nicarico home. He told Lt. Winkler that he was picked up a short time later, and when he stepped into the car

he saw the victim and proceeds from the burglary, including an automatic coffee maker. The defendant said he noticed that the girl had a split lip and was scared. He claimed to have been let off at home while the victim was still alive and to have never seen her again.

Deputy James Roberson, a county jailer, testified that the defendant told him a different story the next day. The defendant told Roberson that:

> "himself and some friends went to the Nicarico home to burglarize the home.
>
> And when this had taken place, they had taken the young girl from the home with them to an unspecified place. He didn't mention where they had taken the young girl. And that they had used the girl, tried to get money for the girl.
>
> ***
>
> He stated that when he had left the young girl was still alive at the time."

During the State's case in chief it was stipulated that the defendant testified before the special grand jury in July 1983. The prosecutor read a portion of that testimony to the jury at defendant's trial.

> " 'Question: Why don't you tell the truth, the whole truth and nothing but the truth?
>
> Answer: I am telling you. I can't tell you any more. What else, you want me to create some other lies? That is all I have done.
>
> Question: That is all you have done?
>
> Answer: That is all, is created lies since the beginning.
>
> Question: Try telling the truth.
>
> Answer: Because I wanted the [reward] money, see, I am trying to do—I made the whole damn thing up. I wanted some damn money. That is, you know, I lied, and look where the lies got me to, possibly murder, which I never even did or had anything to do with.
>
> ***

I am just trying to tell you I lied. You know, so when it is hard, when you don't have a place to stay, especially in the winter. When you have to stay in the car outside.' "

There was evidence that the defendant had been to parties held on that portion of the Prairie Path which extends from Eola Road to the Tollway. The State also elicited evidence that a year and a half before the crimes the defendant had been seen in possession of a nightstick.

The physical evidence is not probative of the defendant's guilt. While investigators found numerous fingerprints in the Nicarico home, eight prints suitable for identification remained unidentified after eliminating the prints of family and frequent guests, and none could be matched to any of the defendants. Furthermore, there is testimony to indicate that police officers seized and presumably examined all of the defendant's clothes and shoes. There was, however, no evidence submitted by the State to suggest that it discovered blood on any of the defendant's clothes or shoes, or that his shoes matched any prints found on the Nicarico property or near the body.

Therefore, apart from the "Ricky" statements, which are not inculpatory on their face, the only evidence tending to establish the defendant's complicity are his four statements to Marquez, Jackie Estremera, Lt. Winkler and Deputy Roberson. Each of those statements contain widely varying accounts of the crime and inconsistencies with the known facts. The record discloses additional statements made by the defendant which were not admitted at trial. Those statements contradicted the four which the State did submit, and they named other alleged participants—Scott McClain, Ray Ortega, Emilio Donatland, "Claudino" and "ToTo"—whom there is no reason to believe to have been involved.

The defendant has highlighted several discrepencies between his statements admitted at trial and the State's evidence. According to the State, Buckley was the driver and the victim was murdered where she was found. Marquez testified, however, that the defendant claimed to have driven the car and to have participated in murdering the girl in an abandoned house. Evidence presented at trial established that the defendant had never held a driver's license or been allowed by his parents to drive any of the family's cars or trucks. (Jackie Estremera testified, however, that he had seen the defendant drive automobiles.) The defendant purportedly told Marquez that the car was parked in the Nicarico's driveway, but the State's evidence indicates that the victim was put in a car at curbside. Moreover, there is no support for contentions in several of the defendant's statements that the victim had been abducted for the purpose of obtaining a ransom and that a coffee maker, diamond rings and other "proceeds" had been stolen from the Nicarico home. Finally, we note an apparent discrepancy, not mentioned by the parties, between the murder weapon, which Marquez said the defendant described to him (a bat or club) and which the defendant attributed to "Ricky" (a nightstick), and Dr. Cleveland's testimony that the blunt instrument with which the victim was bludgeoned left lacerations which were V-shaped at one end.

To explain the defendant's statements, counsel's theory of defense was that his client had invented the "Ricky" stories in order to obtain the well-publicized $10,000 reward which was being offered. Evidence of that intent is manifest in the defendant's admission to Jackie Estremera that he was not going to tell the police anything until he received reward money. Moreover, it is undisputed that the defendant was shown boxes full of money by officers investigating the case and promised

not only payment of a reward, but also employment opportunities in return for more detailed information. During cross-examination by the defendant's attorney, Deputy Sam testified:

"Q. Did you explain to Alex that the procedure on payment of reward being leading to the—information leading to the apprehension and conviction before a reward is paid?

A. Yes.

Q. Did you tell him the reward was at $10,000?

A. I believe so.

Q. Did you or anyone in your presence ever tell Alex that if his information was true, he would get the $10,000 reward and you would help him get a job or that the police would help him get a job?

A. I believe so.

Q. Was Alex ever shown a box full of money?

A. Yes."

And the following colloquy took place during cross-examination of Armindo Marquez:

"Q. Did you tell Alex you knew who killed the little boy from Bolingbrook?

A. Yes.

Q. Did you tell Alex you can get a reward for the information you knew about the Bolingbrook murder?

A. Yeah.

Q. Did Alex tell you he was looking for the reward on the Naperville murder?

A. Yeah, he wanted the reward.

Q. And while you were there, did the police show Alex and you a box full of money?

A. Yeah."

The defendant argues that the unreliability of his statements is heightened by his near mental retardation. In testimony uncontradicted by the State, Dr. Ralph Mesenbrink indicated that he tested the defendant's I.Q. The defendant's score, which was consistent with the

score his records show him having obtained in several examinations since he was eight years old, placed the defendant in the "dull-normal" range, "which was formerly called the borderline mentally retarded range." Dr. Mesenbrink expressed his opinion that the defendant's personality includes a "tall-tale telling quality."

Defense counsel has also attacked the credibility of Jackie Estremera and Marquez, claiming that their testimony must be discounted because they had reasons to fabricate the defendant's inculpatory admissions. Estremera faced possible felony contempt sanctions for having failed to appear as ordered before the special grand jury investigating the Nicarico murder, and the defendant contended that Estremera concocted the defendant's confession because he feared spending time in jail. Marquez, on the other hand, was already in jail charged with multiple counts of residential burglary. Although he had prior burglary convictions and there was reason to believe that Marquez was responsible for at least 100 unsolved burglaries in Kane and surrounding counties, the Kane County State's Attorney's office recommended a minimum sentence in exchange for a guilty plea. Defense counsel introduced a portion of the transcript from Marquez' sentencing hearing held in June 1983, where the assistant State's Attorney, Thomas Sullivan, said:

"I might comment at this time that this recommendation of four years, which is the minimum for residential burglary, Mr. Marquez, is based primarily upon your cooperation with the police, specifically Detective Atchison and also Assistant State's Attorney Tom Knight of Du Page County, who also recommended that your case be viewed with leniency. Otherwise you would not be offered this four-year sentence."

As a witness for the State in this case, Assistant State's Attorney Sullivan denied that Marquez ever requested consideration of his cooperation with Du Page County

prosecutors in the Kane County proceedings, and he testified in response to the prosecutor's inquiry: "No, Mr. Knight, you never spoke to me directly about that."

It is, however, unnecessary to consider the impact of these arguments on the question of whether the defendant's convictions may stand affirmed. We find, as explained below, that the defendant did not receive a fair trial in that statements made by Cruz, and admitted at trial, inculpated the defendant because they were improperly and insufficiently redacted. The defendant was, therefore, implicated by a witness whom he had no opportunity to confront and cross-examine, a violation of this court's precedents and an error of constitutional magnitude. As a consequence, his convictions must be reversed.

## II

Prior to the commencement of trial, the defendant and his codefendants made multiple motions for severance and then for separate juries after the severance motions were denied. The defendant argues that those motions were improperly denied, and that as a result statements made by Cruz were admitted at trial over objection and with insufficient redaction to protect the defendant's right to confront and cross-examine witnesses against him, a right guaranteed by both the State and Federal constitutions. (*People v. Johnson* (1987), 116 Ill. 2d 13, 28; *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. See *People v. Buckminster* (1916), 274 Ill. 435 (anticipating *Bruton* on the ground that the defendant is deprived of his right to a fair trial).) Under *Bruton* and *Buckminster* the out-of-court statement of a nontestifying codefendant is inadmissible in a joint trial unless all references to the nondeclaring defendants have been redacted.

Daniel Fowler, Ramon Mares and Lt. Winkler testified to three oral statements made by Cruz. The defendant claims that through their testimony Cruz' statements were admitted at trial with improper redactions because the names of the defendant and Buckley were replaced with code words which the jury understood to implicate the defendant. He argues that a substantial amount of evidence was admitted to prove that the three defendants were all friends (including two witnesses who were called solely to testify that the defendants were friends) and that they lived in Aurora. Therefore, he claims, redaction of Cruz' statements to replace names with "friends," "friends *** [from] Aurora" and "named individuals" was plainly insufficient since the jury had been told that the defendants were friends who lived in Aurora. Furthermore, the defendant contends that jurors were tipped off by the prosecutors that statements made by Cruz and the defendant had been redacted, causing jurors to be much more sensitive to the use of code words identifying the nondeclaring defendants.

Daniel Fowler, who knew Cruz and said he disliked him, testified that he was alone with Cruz one day in the spring of 1983 when Cruz brought up the topic of the Nicarico killing and said he knew who had done it. During examination by the State, Fowler testified:

"A. He [Cruz] just said they [the people who committed the crimes] were friends of his.

Q. Did he say where they were from?

A. Aurora."

Defense counsel's objection was overruled.

A second instance of allegedly improper redaction occurred in the testimony of Ramon Mares, a distant cousin of Cruz. During his examination by the State there was the following colloquy:

"Q. Just without mentioning any names of anybody, just mentioning whether he [Cruz] said anything else

about she was molested [*sic*] other than the fact he didn't rape her?

MR. JOHNSON [Buckley's counsel]: Your Honor, I am going to ask to be heard, not at this time.

THE COURT: All right.

BY THE WITNESS:

A. That a friend was there and that he knew—he knew also.

MR. JOHNSON: Objection, your Honor. Now I ask to be heard, right now.

THE COURT: Objection sustained and the last answer will by stricken.

The jury is instructed to disregard it.

MR. KNIGHT [Prosecutor]: I believe that is all I have of the witness."

The final instance allegedly prejudicing the defendant's rights occurred during Lt. Winkler's testimony of a statement Cruz made to him while incarcerated in the Du Page County jail.

"He [Cruz] stated that on the day—he was approached one day in February of '83, and that some friends. of his asked him if he wanted to be involved in a burglary, be involved in it. And he said no, he didn't want to.

And they told him that they had a problem. They didn't have a vehicle, and they would like to know if they could borrow his vehicle to use in the commission of this felony.

And he stated, no. However he would then assist them in how to hotwire a vehicle. Then they could gain possession of a vehicle to use.

\*\*\*

The named individuals then approached him, as he stated, two days later and asked him if he wanted to have sex with a little girl.

\*\*\*

He stated that the little girl was at the residence of one of the named individuals."

The State argues that use of the words "friends" and "named individuals" sufficiently protected the defend-

ant's rights because there was no direct reference to him in those three witnesses' testimony recounting Cruz' admissions. This court has recently reiterated, however, that "[a] codefendant's confession or admission does not have to expressly state that a defendant was involved in an offense; it is enough if incriminating implications clearly point to the defendant's guilt." (*People v. Duncan* (1987), 115 Ill. 2d 429, 443.) To determine whether "incriminating implications" arose from the codefendant's admission, "it is proper to consider the statement in light of the State's other evidence" (115 Ill. 2d 429, 443), as well as the prosecutor's arguments and comments before the jury.

The defendant does not claim that this is a case of "contextual implication" like that recently decided by the Supreme Court in *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702, so this case does not present the question of whether *Richardson* will affect Illinois law as defined by *Duncan* and its predecessors. In *Richardson* the codefendant's confession was edited to remove not only the nondeclaring defendant's name, but also the facts of her existence and role in the crime. After redaction, the codefendant's confession disclosed that he had held an incriminating conversation with an unapprehended suspect while driving to the scene of the crime. The defendant's testimony placed her in an automobile with her codefendant when, according to the latter's redacted confession, the incriminating conversation took place. On appeal, the defendant contended that she had been improperly implicated by the codefendant's confession when placed in the context of her own testimony, even though the codefendant's confession was devoid of any reference to a third person's presence during the codefendant's incriminating conversation with the unapprehended suspect. Expressly limiting its ruling to instances where "the confession is

redacted to eliminate not only the defendant's name, but any reference to her existence," the Supreme Court found no *Bruton* violation. 481 U.S. at 211, 95 L. Ed. 2d at 188, 107 S. Ct. at 1709.

In the present case, however, the defendant claims that the redaction of his name from his codefendant's admissions was so poorly done that the jurors knew those admissions referred to him. The context is important to the defendant's allegation of error not because of interlocking evidence like that in *Richardson*, but because it established "friends" as a euphemism identifying the nondeclaring defendants. The *Richardson* majority specifically pointed out that it was "express[ing] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun" 481 U.S. at 211 n.5, 95 L. Ed. 2d at 188 n.5, 107 S. Ct. at 1709 n.5, as was done in this case.

The defendant here was plainly incriminated by the reference to "friends" not only because of the State's repetitive attempts to establish friendship but also by the prosecutor's closing argument, in which he linked the "friends" evidence to admissions made by Cruz and the defendant:

> "[T]he evidence is clear that Cruz and Hernandez are both acquainted with Buckley. If Buckley kicked the door in, all right. *What does that tell you about those admissions they made? Not only are they friends—*
>
> MR. JOHNSON: Objection, your Honor. I object to that as contrary to law.
>
> \*\*\*
>
> THE COURT: So far, it's proper argument. May continue.
>
> MR. KNIGHT: You've seen that they're friends. They live in the same neighborhood. They're all in the same proximity with respect to the victim's home. And I'm using it only in the direction of Cruz and Hernandez be-

cause the fact is they've made statements which are directed as admissions against them.

Okay. But they're also friends of Buckley's.

MR. JOHNSON: Objection, Judge. That inference is improper.

THE COURT: Confine—

MR. KNIGHT: This is only—

THE COURT: Confine it to the evidence now and relate it in that fashion.

MR. KNIGHT: This is only to Cruz and Hernandez I'm talking about. Okay. *They're friends. They're neighbors. Therefore, when they make admissions that they've committed this crime, it's much more*—

MR. JOHNSON: Objection.

THE COURT: Objection sustained.

MR. WESOLOWSKI [defendant's counsel]: It's improper." (Emphasis added.)

The State claims that Cruz had many "friends" and that redaction to "friends" was proper because it did not sufficiently identify or point to the defendant. According to the State, a defendant's right to confront and cross-examine witnesses against him is breached only if the nontestifying codefendant's admission, as presented to the jury, explicitly names the defendant as a participant. Substitution of any word for the defendant's name would, the State's argument suggests, cure any potential *Bruton* and *Buckminster* errors regardless of whether the word chosen identified the defendant as plainly as his surname. That is an argument previously rejected by this court in no uncertain terms. In *People v. Hodson* (1950), 406 Ill. 328, a character of the alphabet was substituted for the defendant's name, and this court reversed the conviction. "The mere substitution [with] a letter *** could not have deceived anyone as to the identity of the person mentioned in the confessions of Hodson's codefendants." (406 Ill. 328, 333-34.) Similarly, this court held that the State made a mere "pretense" of

complying with *Buckminster* by substituting "Blank" for the defendant's name in *People v. Johnson* (1958), 13 Ill. 2d 619, 623-24.

In *Alexander v. State* (Tenn. Crim. App. 1977), 562 S.W.2d 207, prosecutors offered the same answer when faced with a challenge to the use of "friends" in a redacted admission: "The State contends that the *Bruton* violation was cured by substitution of the phrase 'my friend' for Alexander's name each time it appeared in [the codefendant's] statement. This argument is supported, rather lamely we think, by the proposition that the term 'my friend' could apply to any one of many people who were in fact [his] friends." The Tennessee court rejected that argument, as do we, noting that "there could be little or no doubt in the jurors's minds that the reference to 'my friend' *** was in fact a reference to Alexander." 562 S.W.2d 207, 209. See *People v. Bell* (1969), 32 A.D.2d 781, 781-82, 302 N.Y.S.2d 946, 948 ("It is apparent that, despite the trial court's attempt to accomplish an effective redaction of the confessing defendant's statements, the jury could not help but conclude that the 'friends' of Bell were in fact the codefendants").

Use of "friends" in redacted statements was not limited to those three circumstances previously quoted, notwithstanding the trial court's directions that "friends" was not to be used in redacting the admissions. Statements made by the defendant and properly admissible against him were also edited, and references to the codefendants were replaced with "some friends" in the testimony of Sgt. Roberson and "two other named individuals" in Lt. Winkler's. No imagination was required for the jurors to conclude that when Lt. Winkler referred to "two other *named* individuals" in recounting the defendant's statement, the "two other *named* individuals" were the two codefendants seated next to the declarant.

It was equally obvious that when Lt. Winkler testified that Cruz told him he was approached by "[t]he *named* individuals" and asked "if he wanted to have sex with a little girl," Cruz had referred to the defendant.

Aggravating the effect of those improper redactions was the State's disclosure to the jury that they were not hearing the full story. Twice the jury was informed during direct examination of State witnesses that the admissions being testified to had been redacted. As quoted above, the prosecutor asked Ramon Mares to continue his testimony "without mentioning any names of anybody." Also in the jury's presence the prosecutor told his witness Jackie Estremera that "I am going to ask you a series of questions about that conversation, but as I ask you those questions *** do not mention the name of any other person to whom he [the defendant] referred." Thus, this case presents the same question posed in *Hodson* and *Johnson* because here, as there, it was obvious that the codefendant's statements had been altered to remove the names of nondeclaring defendants. Informing jurors that a codefendant named other guilty people but that those names are being withheld is, by itself, grounds for a mistrial. *United States v. Danzey* (2d Cir. 1979), 594 F.2d 905, 917.

On notice that the defendants' admissions were being edited, it was not difficult for the jurors to recognize the connection between the prosecutors' repeated elicitation of testimony that the three defendants were friends, and the use of "friends" in testimony regarding statements made by Cruz and the defendant. Furthermore, during the questioning of Daniel Fowler, the State purposefully inquired whether the "friends" Cruz spoke of were from Aurora. As the jury was informed, all the defendants were from Aurora, and it is difficult to attach any intention to the prosecutor's inquiry other than to establish in

the jurors' minds that Cruz was referring to the defendant in his statement to Fowler.

Making the use of "friends" all the more prejudicial to the defendant's rights is the fact that in two of the unredacted statements Hernandez was not even named. Cruz did not give Fowler any names, and he mentioned only Buckley to Mares. Thus, the statements were more prejudicial to the defendant than if they had not been redacted at all, yet the statement given to Mares had to be altered to preserve Buckley's rights in the joint trial. As this court ruled in *People v. Clark* (1959), 17 Ill. 2d 486, an unfair trial results where a codefendant's statement is admitted which, although not directly identifying the nondeclarant defendant in its unedited form, nevertheless implicates the defendant indirectly. *People v. McVay* (1981), 98 Ill. App. 3d 708, 716.

In *Clark* the codefendant made an admission in which he said that he waited in the car while Odum and two individuals he did not know killed the victim. A police officer testified that the defendant admitted being with Odum and Rocky while Odum killed the victim and the codefendant waited in the car. Relying on *Hodson* and *Johnson*, this court reversed the defendant's conviction even though he had not actually been named in the codefendant's unredacted statement. The court reasoned that the defendant had been denied a fair trial since the codefendant's statement, in conjunction with other evidence presented, contained sufficient information to "advise the jury that the unnamed person was in fact the defendant." 17 Ill. 2d 486, 490-91.

The State argues that even if there was a potential for unfair prejudice by the admission of Cruz' statements, the trial court guaranteed a fair trial by giving limiting instructions advising the jury that statements by Cruz and Hernandez could be considered only against their authors. That is precisely the argument rejected by

this court in *Buckminster* and by the Supreme Court half a century later in *Bruton*. (See, *e.g., People v. Clark* (1959), 17 Ill. 2d 486.) According to *Buckminster*, "[i]t would be difficult to imagine any evidence that would be more prejudicial" than inculpation of the defendant by a nontestifying codefendant. (*People v. Buckminster* (1916), 274 Ill. 435, 448.) To suggest that the jury disregard such explosive evidence is, in the words of Judge Learned Hand, a "recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." (*Nash v. United States* (2d Cir. 1932), 54 F.2d 1006, 1007; see *Bruton v. United States* (1968), 391 U.S. 123, 137, 20 L. Ed. 2d 476, 485, 88 S. Ct. 1620, 1628 ("we cannot accept limiting instructions as an adequate substitute for [the] constitutional right of cross-examination"); see also *Krulewitch v. United States* (1949), 336 U.S. 440, 453, 93 L. Ed. 790, 799, 69 S. Ct. 716, 723 (Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury *** all practicing lawyers know to be unmitigated fiction").) Likewise, the trial court's ruling to strike Mares' reference to a "friend" could not undo the damage already done; as this court has previously warned, "it is practically impossible for the average juror to divest his mind of such testimony." *People v. Bolton* (1930), 339 Ill. 225, 229-30.

We hold, therefore, that under these circumstances the defendant was deprived of his constitutional right to confront a prosecution witness and, consequently, of a fair trial.

## III

Notwithstanding his admissions, as relayed by the testimony of Jackie Estremera, Marquez, Lt. Winkler and Deputy Roberson, the defendant argues that there was insufficient evidence to prove him guilty beyond a

reasonable doubt and that he may not be retried. We have considered the defendant's contentions and disagree with his conclusions. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309 (although reversing on other grounds, a reviewing court must consider a challenge to the sufficiency of the evidence).

Initially, the defendant claims that there was no independent corroboration of his varied statements and that independent physical evidence connecting him with the crimes is necessary for the State to obtain a conviction. Considering the absence of physical evidence and the requirement that "for a conviction based on a confession to be sustained, the confession must be corroborated" (*People v. Willingham* (1982), 89 Ill. 2d 352, 359), the defendant suggests that there was insufficient evidence to support a conviction.

This court has never required proof of physical evidence connecting a defendant to a crime in order to establish his guilt. (See *People v. Taylor* (1974), 58 Ill. 2d 69; *People v. Norcutt* (1970), 44 Ill. 2d 256.) Proof of the *corpus delicti* committed consistently with the defendant's admissions of guilt is all that the corroboration rule demands. As *Willingham* indicates, the corroboration requirement is satisfied by proving that the crime confessed to was in fact committed. (89 Ill. 2d 352, 358-59.) There is no doubt in this case, and the defendant does not deny, that the crimes charged were actually perpetrated.

It has also been argued by the defendant that the evidence properly admissible against him did not prove his complicity beyond a reasonable doubt. The defendant suggests that his statements regarding this case were lies invented to obtain the reward money, and that Jackie Estremera and Marquez were incredible witnesses because of their motives to fabricate. All of the defendant's arguments were aired at trial, however, and the

jury had an opportunity to observe the witnesses and reach a more informed judgment of their credibility than this court can achieve from reading the transcript of proceedings.

"[I]t is not the function of this court to retry the defendant" (*People v. Collins* (1985), 106 Ill. 2d 237, 261), and we cannot disregard the testimony of Jackie Estremera and Marquez merely because they might have had a motive to fabricate. Neither can the court hold the evidence to have been insufficient in light of the defendant's alibi that he was spreading gravel on his family's property with his brother and an unrelated man hired to perform that job. Unlike *People v. Evans* (1962), 24 Ill. 2d 11, and *People v. McGee* (1961), 21 Ill. 2d 440, this case does not present an instance in which multiple disinterested witnesses supported the defendant's alibi, and the jury in this case was not required to accept alibi evidence given by the defendant's family and their hired hand. (See *People v. Thomas* (1956), 7 Ill. 2d 278.) In sum, the prosecution's evidence is neither so strong as to make the State's multiple *Bruton* violations harmless error, nor so weak as to necessarily leave a reasonable doubt of the defendant's guilt (*People v. Collins* (1985), 106 Ill. 2d 237, 261) and prevent his retrial upon the identical charges.

For the reasons stated, the defendant's convictions are reversed and his sentences vacated. This cause is remanded to the circuit court of Du Page County for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.