THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STANLEY HOWARD, Defendant-Appellant.

First District (5th Division)   No. 86—0147

Opinion filed April 22, 1988.—Rehearing denied May 23, 1988.

PINCHAM, J., dissenting.

Paul P. Biebel, Jr., Public Defender, of Chicago (Mark Stein, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Lynda A. Peters, and Charles E. Antonietti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

This is an appeal by defendant, Stanley Howard (Howard), from a conviction after a jury trial of two counts of armed robbery and sentence of 28 years.

On November 5, 1984, Howard was indicted on two counts of armed robbery and one count of attempted murder. The charges arose out of a March 14, 1983, incident involving two Chicago police officers. The entire matter, including the attempted murder charge, was tried before a jury. The jury was not able to reach a verdict on the

attempted murder charge and the State nol-prossed[1] that charge. On January 9, 1986, the trial court sentenced Howard to 28 years on the two charges. A notice of appeal was filed on January 14, 1986. The appellant's brief was filed on December 18, 1986. The appellee's brief was filed on August 20, 1987.

On appeal the defendant asserts that his conviction and sentence must be overturned because of three alleged errors. Howard first charges that the testimony of one witness was inadmissible evidence of other crimes. He next claims that the court's failure to grant him a continuance to perfect his impeachment of a witness was prejudicial error. He finally contends that his sixth amendment right to confront witnesses was lost when testimony concerning what Michael West said was used against him.

We affirm the conviction and sentence for the following reasons.

The defendant was on trial for the armed robbery of two off-duty police officers, Margaret Hall and Robert Hanley. The first State witness was Donita Washington, who testified that Howard robbed her. The trial court permitted the testimony over defendant's objection.

■■ As a general rule of law, evidence of other crimes is not admissible in a criminal case because of the high risk of prejudice. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.) As with other rules of evidence, there are exceptions to this general rule. Among these exceptions is that evidence of other crimes is admissible if the evidence tends to show motive, intent, identity, absence of mistake or *modus operandi*. (*People v. Kokoraleis* (1987), 154 Ill. App. 3d 519, 507 N.E.2d 146.) If the evidence tends to show motive, etc., it is admissible even if it may also hint at a propensity to commit crime. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) The State contends Washington's testimony proved identification and *modus operandi* and that it was admissible as an exception to the general rule. Defendant argues that it was not.

■■ *Modus operandi* means "a pattern of working" and refers to a pattern of criminal behavior so distinct that separate crimes can be recognized as the work of the same person. (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292.) The crimes involved need not be identical but must, nevertheless, possess distinctive features. (*Kimbrough*, 138 Ill. App. 3d 481, 485 N.E.2d 1292.) Finally, a trial court's decision on the issue of *modus operandi* will be overturned only where an abuse of discretion occurs. (*People v. Martin*

---

[1] *Nolle prossed* is a term now used by attorneys to denote the common law term of nol-pros, meaning "we do not prosecute."

(1979), 80 Ill. App. 3d 281, 399 N.E.2d 265.) Based on these settled rules, this court cannot overturn the trial court's conclusion that the testimony of Washington was admissible.

■ The evidence discloses that Officers Hanley and Hall were robbed as they were sitting in their car at 109th and Western in Chicago. After threatening to rape Hall and driving Hanley and Hall to a different location and struggling with Hall, defendant fled. Several shots were exchanged by Hanley and defendant during the escape. The time of the event was about 1 a.m. on March 14, 1983. On that same morning a witness, Kevin McMahon, testified that he was parked at 109th and Western, heard some shots fired, saw defendant go to the car behind him, point a gun at him and drive away in a 1978 or 1979 Monte Carlo.

Hanley's, Hall's and McMahon's descriptions of their assailant was similar to Washington's. Washington testified that she was robbed on March 13, 1983. She testified that she and her son were walking to their home on South Elizabeth. Defendant walked up to her with a gun as she got out of the car. He threatened to rape Washington. He drove her and her son to her mother's apartment and took other things. He took Washington's keys and drove off in her car with license plate No. ER 3042. Her car was a 1979 Monte Carlo.

The gun used in both situations was a small handgun. The description of the offender's gun was similar, the offender in both cases threatened to rape the victims, and the offender used the same type of vehicle as in the March 13 and 14 robberies. These similarities were sufficient to sustain the trial court's denial of the defendant's motion *in limine* and later use of evidence with the instruction to consider the evidence only on the issue of defendant's identification, purpose and design.

In his second point, defendant argues that if the testimony of Washington was admissible, he was denied a fair trial because the trial court denied him a continuance to secure a witness that could impeach Washington. Washington testified at trial that she would never forget the face of the man who stuck a gun at her side and identified defendant as the man who robbed her in a police lineup held on November 2, 1984. A police report indicated that at no time did Washington see her assailant's face. The defense counsel moved for a continuance which the trial court denied.

■ The granting or denying of a continuance to obtain evidence is within the discretion of the trial court. (*People v. Allgauer* (1969), 114 Ill. App. 2d 405, 252 N.E.2d 671.) When reviewing the exercise of the trial court's discretion in that regard, an appellate court must de-

termine whether defendant acted diligently to obtain the evidence and whether the evidence would be material and might affect the outcome. *People v. Tillman* (1980), 82 Ill. App. 3d 430, 402 N.E.2d 825.

■ Finally, the court must determine whether defendant has been prejudiced in his right to a fair trial. (*People v. Robinson* (1973), 13 Ill. App. 3d 506, 510, 301 N.E.2d 55.) Weighing these factors, we cannot say that the trial court abused its discretion in denying the continuance: (1) the testimony was alleged impeaching testimony; (2) the defendant knew that Washington would testify, so her testimony was no surprise to defendant; (3) it does not appear that defendant acted diligently to get the absent witness' impeaching testimony; (4) the witness was unavailable; (5) it does not appear that the impeaching testimony would have affected the outcome of the trial. Accordingly, this court cannot say the trial court abused its discretion in denying a continuance to enable Howard to obtain the alleged absent impeaching witness.

■ As his final point, defendant argues that Michael West's testimony was used against him in violation of his constitutional right to confront and cross-examine witnesses. This final contention lacks substantive merit.

At trial a detective testified he began looking for Howard after conversations with an informant. During an interview, a detective told Howard about the information, following which Howard admitted the crimes.

Defendant Howard testified in his own defense. On cross-examination it was established that defendant knew West. West's sister is the mother of defendant's son. On rebuttal, Detective McWeeny testified that the informant he used was West. The court denied defendant's request for a continuance to procure West to testify. The court did strike the testimony of West from the record and admonished the jury to disregard all questions and statements by the People which incorporated alleged statements of West.

Although it was error for the State to suggest statements made by West, the error does not rise to the level of reversible error in this case. An instruction to disregard evidence ordinarily cures error in its admission. (*People v. Lindsay* (1978), 67 Ill. App. 3d 638, 384 N.E.2d 793.) Defendant has suggested no reason why the trial court's striking of the tainted testimony and instruction to the jury to ignore did not cure the error in admitting the testimony. In the case cited by defendant on this point (*People v. Campbell* (1983), 115 Ill. App. 3d 631, 450 N.E.2d 1318), a new trial was ordered because the prosecutors defied the court's instruction in their final argument informing

the jury that the absent witness implicated the defendant. That did not occur in this case.

The record reveals that, contrary to the argument of the defendant, he was given a fair trial and the asserted errors were at best harmless and did not deprive him of a fair trial.

Accordingly, defendant's conviction and sentence is affirmed.

LORENZ, P.J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. The defendant was flagrantly denied a fair trial and the jury's verdicts lack integrity and were irreparably tarnished by:

(1) the improper admission of evidence of the defendant's commission of armed robbery and kidnapping offenses upon Donita Washington, for which the defendant was not on trial;

(2) the trial court's gross abuse of discretion in denying the defendant, who was in custody, a continuance to produce a police officer to testify in accordance with her police report that Donita Washington stated to her that she never saw the offender's face, contrary to and to impeach Donita Washington's trial identification testimony that it was the defendant who robbed her and that she would never forget his face;

(3) the improper admission of

(a) the voluminous testimony that the officers arrested the defendant for the Margaret Hall-Robert Hanley offenses and the Donita Washington offenses based upon information from an informant;

(b) the defendant's cross-examination testimony that he did not admit to Michael West, his friend and the brother of his girlfriend, who was the mother of his child, that he committed the Hall-Hanley or Washington offenses; and

(c) the State's rebuttal testimony by the investigating officer that Michael West was the informant who told the officer that the defendant had confided to him that he committed the offenses;

(4) the trial court's gross abuse of its discretion in denying the defendant a continuance to produce Michael West as a witness, who would deny that he told the officers that the defendant admitted to him that he committed the offenses; and

(5) the violation of the defendant's constitutional right to confront and cross-examine witnesses.

I have previously set forth my views and interpretations of the le-

gal principles which govern the admission of evidence of a defendant's commission of offenses for which the defendant is not on trial in my dissenting opinions in *People v. Hayes* (1988), 168 Ill. App. 3d 816, *People v. Partin* (1987), 156 Ill. App. 3d 365, 374-94, 509 N.E.2d 662, and *People v. Harris* (1986), 147 Ill. App. 3d 891, 896-909, 409 N.E.2d 621. I therefore will not repeat those principles here. These legal principles did not authorize and indeed prohibited the admission of evidence of the defendant's commission of the Donita Washington offenses at the defendant's trial for the Margaret Hall and Robert Hanley offenses. The admission of this evidence and the prosecutors' opening statement and extended closing arguments to the jury thereon were clearly erroneous, prejudicial, denied the defendant a fair trial and grievously impugned the integrity of the jury's guilty verdicts.

The defendant was charged with and was on trial for armed robbery of Margaret Hall and Robert Hanley and attempted murder of Robert Hanley on March 14, 1983. In a separate indictment the defendant was charged with armed robbery and aggravated kidnapping of Donita Washington on March 13, 1983. The defendant's attorney presented a pretrial motion *in limine* to exclude evidence of the defendant's commission of the Donita Washington offenses. During the hearing on said motion the prosecutor stated, "[H]e is charged in a separate indictment with armed robbery of Donita Washington, that being a separate case." The prosecutor admitted, "Legally, I don't think that we can join them [in one trial]." Moreover, the prosecutor was unable to articulate a legal basis for the admission of evidence of the defendant's commission of the Donita Washington offenses. The prosecutor confessed:

> "In this case, *what we have is kind of a hybrid between identification and modus operandi* ***.
>
> In this case, *the probative value of the testimony that we would have, that Donita Washington was armed-robbed* about— it would be an hour prior to the incident in this case, that she was with the defendant for a long period of time, that the defendant used a gun, that the defendant said some things to her during the course of the armed robbery which were similar to things that were stated to Lieutenant Hanley and Margaret Hall, *help to establish the identification and the modus operandi, although the modus operandi is not the crucial part here.*" (Emphasis added.)

From the prosecutor's foregoing trial court statements, it is clear—from the majority's language that "the State contends Wash-

ington's testimony proved identification and *modus operandi*" (169 Ill. App. 3d at 538)—that the State has shifted positions before this court.

The trial court overruled the defendant's pretrial *in limine* motion. In doing so the trial court completely ignored the following mandate of this court in *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667:

> "*Modus operandi* means, literally, 'method of working,' and refers to a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer. \*\*\*
>
> \*\*\* In arguing that the rapes share a *modus operandi*, the State lists approximately 19 similarities among the crimes. Some of the purported similarities are irrelevant coincidences \*\*\* and others are merely descriptive of the crime of rape \*\*\*. While a showing of *modus operandi* does not require that the similarities be unique to the offenses being compared, *there must be 'some distinctive features that are not common to most offenses of that type.'* [Citation.] In the case at bar, the State has simply failed to make the '*strong and persuasive showing of similarity*' required to demonstrate modus operandi. [Citation.] The State's lengthy list of purported similarities does not establish that the three alleged rapes were 'so nearly identical in method as to earmark them as the handiwork of the accused.' " (Emphasis added.) 106 Ill. App. 3d at 999-1000.

Evidence of *modus operandi* is admissible only if such evidence establishes a "pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer." (106 Ill. App. 3d at 999.) Evidence of mere nondistinct similarities in the commission of separate offenses is not admissible to establish the identity of the perpetrator of the separate offenses. Yet the trial court, in denying the defendant's *in limine* motion to exclude evidence of the commission of the offenses against Donita Washington on March 13, 1983, at the defendant's trial for commission of the Hall-Hanley offenses on March 14, 1983, erroneously ruled:

> "I think the similarity between the—based on the offer of proof in the case on trial and *the facts surrounding the circumstances of the robbery of the woman* [Donita Washington] in question where the case was taken, *are similar, extremely similar in both method of operation,* space, and time, and it goes definitely to show identification. And for that reason I feel it is probative and I am going to allow them to go into it. Your mo-

tion *in limine* is denied." (Emphasis added.)

The trial court further disclosed and relied on the erroneous concept that evidence of the commission of a crime for which the defendant was not on trial was admissible simply because of similarities to the offense for which the defendant was on trial. The trial judge repeatedly stated to the prosecutor: "I want you to confine yourself to those aspects that are similar to the method of operation in the case that he is on trial"; "I don't want you going into areas that are not similar to the case that he is on trial for"; "The purpose of the sidebar is to make sure you don't go into any areas that are not similar to the case that he is on trial for"; "I just want you to stay away from areas [in the offenses against Donita Washington] that are not similar to what you suspect the case in chief to show, as far as the victims, Hanley and Margaret Hall are concerned"; and "I caution you to try to limit yourself only to those areas that you expect to be similar ***."

The prosecutor devoted much of his opening statement to the jury to the March 13 Donita Washington offenses. After stating to the jury that the defendant was charged with the crimes of attempted murder and armed robbery of Robert Hanley, a lieutenant of the Chicago police department, and armed robbery of Margaret Hall, an officer of the Chicago police department, the prosecutor promptly told the jury:

> "You will hear testimony from a person by the name of Donita Washington. Donita Washington is a woman who, on the date of March 13th, 1983, was out during the course of the day. Later on in the evening, this being a Sunday, she went over to her mom's house and she picked up her little boy. Donita Washington picked up her boy and brought him home to the house where they lived at 86th and Elizabeth.
>
> Now, Donita—you will get an opportunity to see her. She is a working woman, she's got goals, she's trying to make something of her life. And you will hear what happened to her on that day.
>
>                 * * *
>
> On that day, March 13th, 1984, [*sic*] at about 11:00 o'clock—1983, at about 11:00 o'clock, when Donita Washington was returning to her house at 86th and Elizabeth with her child, this defendant appeared in her life.
>
> He came up to her, held a gun at her, told her that he was going to rob her. And then again, about an hour or so of terror for her, where he took her money, he took her jewelry, made her go to her house, took things from there, and he wasn't satisfied. He did other things to her. You will hear about them.

Made her go to her mom's house to get more money, and finally brought her back to her house where he ransacked the house and left her there with her boy, he took the keys to her car and drove off.

And he left that area of 86th and Elizabeth, here on the south side, and drove around."

The prosecutor then narrated to the jury what he expected the evidence to establish regarding the defendant's commission of the March 14 armed robbery and attempted murder offenses against Chicago police officers Margaret Hall and Robert Hanley. But Donita Washington was the first trial witness to be called by the prosecutor to testify before the jury.

In minute detail, Washington testified about her robbery. She related that on the early evening hours of March 13 she attended a political fund-raising function for Mayor Washington, during which time her son was at her mother's home; she left the political function between 10 and 10:15 p.m., went to her mother's house, picked up her son, dropped off a girlfriend at 81st and Ellis Avenue and went to her home in the 8600 block on south Elizabeth. She parked midway in the block. She and her son exited the car and started walking toward her residence. A man with a gun walked up to her and forced her and her son back into the car. The man frisked her and took her jewelry, watch and money. The man threatened to rape her and Washington pleaded to him not to do so, particularly in the presence of her child. She told the robber that he could go to her mother's house for more money. She gave the robber her mother's address and they drove there. The robber held the gun in Washington's back and they went to the door of Washington's mother's residence. The robber told Washington to tell her mother that he was Washington's friend and that he had a stolen 25-inch color television set that Washington wanted to purchase for $200. Washington's mother came to the door, saw her and the man standing there, would not completely open the door but only partially opened it with the chain on. Washington asked her mother for money and told her what it was for. Washington's mother gave her $30, which Washington gave the man. The man drove Washington and her son back to Washington's apartment. They entered the apartment and the man took additional jewelry and a new grey tweed coat. The robber made Washington give him both keys to her car and her driver's license and he left. Washington related that she viewed many pictures and several lineups and that on November 2, 1984, she picked the defendant out of a lineup as the person who robbed her on March 13, 1983, 20 months after the robbery. Washington also identi-

fied in court the defendant as the robbery offender.

As Donita Washington concluded her direct-examination, she was finally asked by the prosecutor, and she dramatically answered:

"Q. I just want to ask you one more question?

A. Sure.

Q. Did you have a good opportunity to observe the person that robbed you in the street that day?

A. Well, yes, I did.

Q. Will you ever forget that man's face?

A. *No, I can never forget someone who sticks a gun in my side.*

[Assistant State's Attorney]: Your witness."

On cross-examination, Donita Washington testified that after the robbery two policewomen came, she told them what had happened, and the officers made a report. She further testified on cross-examination:

"Q. Did you ever tell them that at no point were you allowed to see the offender's face?

A. No, I did not.

Q. You never said that to them?

A. Not that I recall, no.

Q. Well, are you having some doubt about saying that?

A. No, I have no doubt at all. If someone sticks a gun in my side, I can remember exactly who it is.

\* \* \*

Q. Now, after you—after this occurred, these officers, these police officers, these women who were present—what did you do then?

A. I finished giving them the report.

Q. Okay. And did they write that report down?

A. As far as I know, they did, yes.

Q. Okay. And did you ever say to them that you would have any doubt about identifying this person?

A. No, I would never have a doubt identifying him."

When Donita Washington concluded her testimony, the defendant's attorney immediately informed the trial court:

"I am taken by total surprise. I have police reports tendered to me by the State. And one of the statements is what I asked her: At no point in time was the victim allowed to see the offender's face.

THE COURT: Sure. You laid a foundation for that. You can perfect it by calling the policeman.

[Defense Attorney]: Right. But first of all I would like the State to bring these officers in, and I would like to have this woman kept available so that I can also, after having the police officers testify, make sure that these are the police officers that she talked to.

THE COURT: *** That is the beat report on her incident.

[Defense Attorney]: Yes.

* * *

THE COURT: *** She will be available if need be, and I am sure they will bring the police man in, so you can talk to them.

[Assistant State's Attorney]: *** [T]here is a one-sentence statement in there that says that at no point in time was the victim allowed to see the offender's face. Of some policeman's interpretation, I don't think there's been a basis laid to impeach with any officer. He asked her one blunt out question.

THE COURT: Well, she said she saw his face, no question about it. His foundation was, didn't you tell the police that at no time did you see his face? And she said no. That is the foundation. He tried to ascertain who those policemen were. He did ascertain it was during the course of an interview at her house. All right. He's laid the best foundation for impeachment. Now, he's got to perfect it. He's under an obligation to perfect it, because the jury heard it, so there are two ways to do it. We could force you to subpoena the policeman in, or we can expedite the matter and bring them in. He has the right to call the policeman in the report. *** That took the report ***. My question to you is rather than split hairs, will you make them available?

[Assistant State's Attorney]: The women, I suppose.

* * *

THE COURT: Will you try to make them available?

[Assistant State's Attorney]: What if we can't?

THE COURT: If you can't, you can't.

* * *

She denied that she made the statement, so you perfect the impeachment with the officer. Either the officer is going to say she told me that, or I thought she told me that—I don't know what he is going to say. You [defense attorney] have an obligation to perfect it. *** You [assistant State's Attorney] have an obligation to bring them in.

[Assistant State's Attorney]: I will bring them in.''

Chicago police officer Margaret Hall was then called as a State's

witness. She testified that she and Chicago police Lieutenant Robert Hanley, at about 1 a.m. on March 14, 1983, while sitting in an automobile at 109th Street and Western Avenue in Chicago, were robbed by a black male, who also threatened to rape Hall, and who drove Hall and Hanley to another location, where a struggle ensued between the robber and Hanley. The robber fled and shots were exchanged between Hanley and the robber. During the period immediately following, Hall viewed several lineups but did not identify the robber. Twenty months later, on November 2, 1984, she viewed a lineup and identified the defendant as the robber.

At the conclusion of Margaret Hall's testimony, the defense attorney made a motion for a mistrial, stating:

"Your Honor, at this time I am going to make a motion for a mistrial. Certainly an offer of proof was made by the State's Attorney as to what Donita Washington's testimony would be, as toward Margaret Hall and the other armed robbery. Certain elements were stated that it was going to be proved that this was a *modus operandi* that was similar to this crime. You have now heard testimony from both Donita Washington and Margaret Hall. The only thing similar seems to be the identification of the defendant. There seems to be nothing else similar, not conversation, not what occurred, not the facts of the same gun.

\* \* \*

\*\*\* [T]here is nothing in Donita Washington's testimony that would show that the same person committed the same crime by *modus operandi*, not by identification, which is what the State said. The State said we are going to show Donita Washington's testimony not only for identification but more for *modus operandi*. That is not true."

The trial court ruled that the defendant's mistrial motion was premature inasmuch as the State had not presented all its evidence. Thereupon, Chicago police department Lieutenant Robert Hanley was called as a State's witness. His testimony was substantially the same as the testimony of Margaret Hall. Kevin McMahon then testified on behalf of the State that as he sat in his parked car at 109th and Western Avenue on the morning of March 14, 1983, he heard shots, saw a man enter a 1978 or 1979 Monte Carlo automobile parked behind him and drive away, after the man had fired a shot at him. Oddly, McMahon at no time during the 20 months the police investigated the robberies before the defendant's arrest and at no time during the 13 months after the defendant's arrest and before the defendant's trial viewed a lineup or pictures. McMahon identified the defendant for the

first time in court on the date he testified, December 10, 1985, as the person he had seen during the early morning hours of March 14, 1983, two years and eight months previously.

The defense attorney renewed his motion for a mistrial and urged, "We have absolutely no contact with the *modus operandi* which the State said they were going to tie up. \*\*\* [T]he testimony of Donita Washington has been prejudicial, that it hasn't been tied up \*\*\* the prejudicial effect has been to deny the defendant a fair trial. I don't see any *modus operandi* from the testimony of Donita Washington from the proffer of proof made by [the prosecutor], that's tied up by any of these witnesses that have testified today." The trial court asked the prosecutor to respond to the defense attorney's mistrial motion and statements in support thereof. The prosecutor again vacillated and abruptly deviated from his previous positions. He responded:

> "Judge, all I keep hearing is argument about *modus operandi. That is not why we introduced it.* We introduced it as a hybrid situation, similarity of this man's identification, and one armed robbery to another. He [the defense attorney] can argue *modus operandi* all he wants, but that is not what we said. \*\*\* I don't care if counsel can't see the tie-up. I hope the jury can, and that is what we rest on." (Emphasis added.)

The defense attorney replied:

> "Now that he has not proved the connection, he wishes to withdraw it and to try and say, well, it was just a hybrid. *There is no such thing as a hybrid in this law.* \*\*\* When [the assistant State's Attorney] made that proffer of proof he said it was an M.O. and we are going to say that they frequented these places. That was their word. He was committing this crime in the same operation, and there is nothing in the crime of Donita Washington that has anything to do with Margaret Hall, that has anything to do with Hanley, that has anything to do with Mr. McMahon. They are two totally separate incidents. The fact that the State says they were committed by the same person does not by and of itself show that they can use that testimony against the defendant. I think that they have used it, that they have made fast and loose—that they have in their desire to get a conviction, have used this testimony when they knew that there was no M.O. they knew these armed robberies were separate and distinct." (Emphasis added.)

The trial court did not, and indeed the trial court could not, predicate its overruling of the defendant's mistrial motion on the legal

premise that the State's evidence to establish *modus operandi* established "a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer." (*People v. Barbour* (1982), 106 Ill. App. 3d 993, 999-1000, 436 N.E.2d 667.) Instead the trial court overruled the defendant's mistrial motion simply because the crimes were similar. This was an erroneous ruling and it was based upon an improper ground. The trial court stated and ruled:

> "These two incidents were strikingly similar. *** There is no question in my mind that those incidents are strikingly similar, and the State can use it in their case in chief to establish identification or method of operation, or a combination thereof. *** And your motion for a mistrial is denied."

The trial court's reliance on simple similarities in the offenses was a new and novel basis for the admission of evidence of crimes for which an accused was not on trial. The majority's reliance on the evidence of similarity of the guns and vehicles used in the offenses and that both female victims were threatened with rape as a basis for validating admission of the evidence of the offenses against Donita Washington was ill founded. Donita Washington testified that she was not familiar with guns and when asked if the gun used by the offender was a rifle or a shotgun, she merely responded, "No, it was just a small handgun." Margaret Hall described the offender's gun as a .22 calibre revolver and Chicago police Lieutenant Robert Hanley described the offender's gun as a .22 calibre revolver. When asked, "Did it have a long or short barrel?" Lieutenant Hanley answered:

> "It was long hand gun, sir, Saturday Night Special."

Conversely, Kevin McMahon described the weapon he observed in the offender's hand as a small revolver, handgun. Regarding the "vehicles used in the offenses," Officer Margaret Hall and Lieutenant Robert Hanley did not see or describe any vehicle used by the offender.

This inadmissible evidence of the commission of the offenses against Donita Washington was unduly and heavily relied on by the prosecutors in their closing arguments to persuade the jury to convict the defendant of the Hall-Hanley offenses. The prosecutors argued to the jury:

> "You have heard from *Donita Washington*, you heard from Kevin McMahon, you heard from Michael Hanley, you heard from Margaret Hall about what happened in their lives on March 13th and March 14th of 1983 ***. The evidence we presented to you we presented to you for one purpose, because we only have issue in here *** but it all boils down to one thing.

You have to decide whether this is the man who on March 13th and 15th terrorized those four people or whether he didn't and that is what it boils down to. You are here to decide that. *** I submit to you right now the evidence that you heard from that witness stand proves beyond a reasonable doubt that on March 13th and 14th he committed the armed robbery of Robert Hanley, committed the armed robbery of Margaret Hall and he attempted to kill Robert Hanley and he did it after he robbed and used the implements he gained from *Donita Washington.*

We presented you those four witnesses, *Donita,* Hanley, Hall and Kevin in the order in which things happened on that night. We did that for a purpose, because that is the time sequence, that is the time sequence that he did those things to those people.

*Donita* was first and Hanley and Hall and then Kevin saw what happened and later on he was arrested, months later by Maslanka and talked by McWeeny, listen to what *Donita* told you.

It is not a difficult case. You will see the picture of her car, that this is her car, she identified it and you will see the small decals, tiptoes she has hanging from the rear view mirror or the boxing gloves and you will see the license plate on there?

What did he do to *Donita.* He got her coat, he got the socks that he put on his hand, he got the car. And how did he do it? He patted her down, he got her money, he got her jewelry and when he wasn't satisfied with that, then he wanted some sex from her because he didn't have enough money and enough jewelry from her.

\* \* \*

I mean, do you remember the way that *Donita Washington* said she picked that man out? She can't have imagined things like that, Ladies and Gentlemen. You remember the way she said 'will never forget that man, what he did for me, I will never forget him, I didn't need to see him walk around, I didn't need him to say anything, I will never forget him.' Do you think that sounds like it's true? Do you think that sounds like it's true? Do you think that is something that happened when a man terrorizes you, when a man tells you he is going to rape you while your son is in the car? Do you think that would be something that is burned in her mind? It sure is.

\* \* \*

*** I want you to take *Donita Washington's* testimony and

then we Hanley, Hall and Kevin McMahon, pretend for a minute that Kevin McMahon and Margaret Hall and Robert Hanley didn't see his face, they didn't see his face. Pretend that for a minute and think about what we have. Think about what *Donita Washington* tells us about his description, about the coat, about the gloves, about her car and then think about what Hanley and Hall and Kevin tell us about his description, about his coat, about the car, about what he wants and the way he goes about getting what he wants. *** That is powerful evidence, Ladies and Gentlemen, without them seeing his face. You know it's the same man.

\* \* \*

*Donita Washington*, is she telling me the truth? Well, let's weigh that on the scale of truthfulness. That weighs on that scale, that is what it's here for, you decide whether a man that is convicted like that is a truthful person when he is compared to a person like *Donita Washington* and Kevin McMahon and Hanley and Maslanka and Hall and McWeeny?

\* \* \*

He grabbed *Donita Washington* two blocks from his own house and I guess he didn't have a car and he had to walk over there to grab her and he grabbed her there with her son in the middle of the night in the middle of the street and then he took her car and he took it a mile and a half away, two miles away and he did the same thing to different people a little bit away.

\* \* \*

*** I believe you will all be convinced beyond a reasonable doubt that he is, in fact, the man that committed both the armed robbery of Hanley and Hall and he was the man that was seen by Kevin McMahon, that he was the man that did that with *Donita Washington's* car ***.

\* \* \*

It has to be a concerted effort to lie about him and if he is not guilty of this, then those people who paraded onto that witness stand and took that oath, *Donita Washington*, Kevin McMahon, Lt. Hanley, Dt. McWeeny, Margaret Hall, the Sergeant from Robbins, every one of those persons are the most evil, treacherous and devious people that you will ever meet, because if what they said is not true, each of them individually, then they all had to get together and conspire to get him.

\* \* \*

What motive does *Donita Washington* have to come in here

and say he is the fellow that did it? I will never forget it, he was with the fellow in my car for an hour, he is the guy that had my gray coat, he is the guy that had my car and told me in front of my ten year old son that I didn't have enough money so he was going to rape me.

\* \* \*

\*\*\* This is a once in a lifetime situation. *Donita* was in this situation that was burned into her mind. It's a situation where that face is a face she will never forget.

\* \* \*

In a case like this, this once in a lifetime situation, the mind takes a mental picture and that period of time, that hour, that terrifying terrible hour she was with him is forever burned in her mind and it's a mental impression that never goes away.

It is a time for her that is frozen in time. So if she is telling the truth that she had to have some motivation for telling you all these terrible things happened, she had to have some motivation to get together to conspire with these other people.

\* \* \*

And if Counsel wants, fine, maybe Hanley and maybe Margaret Hall weren't able to draw this picture as best they could. What about *Donita Washington*, what about what she saw?

My goodness, she had a tremendous opportunity to see what happened. She is with the guy for an hour, she sees his face. Afterwards she sees a lineup, that is not him, that is not him, I see pictures, that is not him. Finally she sees this lineup, instantaneously that is the guy and there is a reason for that. \*\*\* Well, if you are in a situation where you are in a car with your son and a fellow that is sitting next to you has a gun, don't you think that you never forget that image, you never forget that face, ever?

\* \* \*

The evidence that you heard in this case was overwhelming, absolutely overwhelming. You had four different people who saw the person that did the crime, every one of them described him, \*\*\*.

\* \* \*

In his opening statement Counsel made certain promises to you. He told you that in his opening statement that *Donita Washington* looked at the composite the next day and said 'that is him.' Did you hear one iota of evidence that is what happened? She didn't say that. She got up there and said no, that

is I am not satisfied, that is not exactly right to me. She never said, 'That is him.'

He also testified in opening statement you will hear from *Donita Washington* about her being armed robbed, but he is not charged with that crime. That is absolutely untrue as well. Stanley Howard is charged with that armed robbery of *Donita Washington* and he will be tried for it.

\* \* \*

Skulking around in the middle of the night like a predator looking for prey, skulking around until he finds someone to arm rob, skulking around looking to pounce upon someone. You have an opportunity to tell him now 'No more.' You have an opportunity to tell the witnesses in this case who had the courage to come forward, to tell you what happened to them, you have an opportunity to tell *Donita Washington,* yeah, the law is on your side, the law works, the guy you said that did it, fine." (Emphasis added.)

The majority concludes that the trial court's instruction to the jury "to consider the evidence [of the commission of the offenses against Donita Washington] only on the issue of defendant's identification, *presence* and *design*" (emphasis added) (169 Ill. App. 3d at 539) justified the admission of that evidence and the court's denial of the defendant's *in limine* motion to exclude it. The prosecutor never suggested that the evidence was presented to establish the defendant's *presence* or *design.* Nevertheless, the trial court instructed the jury:

"Evidence has been received that defendant has been involved in a [*sic*] offense other than that charged in the indictment. This evidence has been received solely on the issue of defendant's identification, *presence,* and *design.* This evidence may be considered by you only for the limited purpose for which it was received." (Emphasis added.)

This instruction was incorrect, inapplicable and grossly inadequate to properly direct the jury on its use of the Donita Washington evidence even if it had been properly admitted, which it was not. *People v. Lindgren* (1980), 79 Ill. 2d 129; *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 272; *People v. Tate* (1982), 106 Ill. App. 3d 774, 436 N.E.2d 272; *People v. Triplett* (1981), 99 Ill. App. 3d 1077, 425 N.E.2d 1236; *People v. Bucker* (1974), 23 Ill. App. 3d 394, 319 N.E.2d 225.

The trial court clearly abused its discretion when it denied the defendant's request for a continuance to enable him to produce the police officer to whom Donita Washington initially reported the

crimes, to testify that Donita Washington told the officer that she never saw the face of the offender who robbed her, to impeach Donita Washington's contrary testimony. At trial, Donita Washington repeatedly testified that she clearly saw the offender. She described his height, weight and age. She testified further:

"Q. When that person walked up to you when you were on the street, did you look at him?

A. Yes. I did have the opportunity to see him then.

* * *

Q. Did you see his face?

A. Yes."

She testified that on November 2, 1984, 18 months after she was robbed, she went to a lineup and "immediately recognized that person that had robbed [her]." And that she did not "have any problem whatsoever [at the lineup] recognizing him," the defendant in court, as the person who had robbed her, that she "would never forget his face" and that she "remembered exactly who it [was]."

The defense attorney stated that he was taken by surprise by Donita Washington's identification testimony of the defendant as her offender. He informed the court that he had a police report given him by the prosecutor which stated that Donita Washington informed the reporting police officer that she never saw her offender's face. Donita Washington denied on cross-examination that she had told the reporting officer that she had not seen the offender's face. The trial court properly ruled that defense counsel had laid a proper foundation to call the reporting officer. Pursuant to the trial court's direction, the prosecutor assured the trial court and defense counsel that he would produce the reporting officer for the defense attorney to call as a witness to impeach Donita Washington's denial.

When the time arrived for the prosecutor to produce the reporting officers, only one of the two reporting officers was produced, but oddly enough, she did not write the report and she did not remember what Donita Washington had told them. The reporting officer who wrote in the report that Donita Washington had stated that she never saw the offender's face was not produced. The extensive colloquy between the trial court and counsel on the reporting officer's absence and the defense attorney's request for a continuance to produce her clearly reveals and substantiates that the trial court abused its discretion in denying the defendant's request for a continuance to produce the officer:

"THE COURT: I have just been advised that one of [defense attorney's] witnesses, which is a police officer that wrote the

original report relative to an incident involving a Mrs. Washington, one of the officers is present, where is the other officer, Mr. [Assistant State's Attorney]?

[Assistant State's Attorney]: The other officer is unavailable. *She is on medical, we couldn't track her down.* When the Court said we could try to get both of them, we were successful in getting one, we located the unit she is in, she is in the interview room, she had been interviewed by Counsel.

THE COURT: During the course of the trial, [defense attorney], while questioning Mrs. Washington on cross examination, asked her if she did not, in fact, tell the original police officers, one of which is present, the other which is on the medical, both of which who authored a report. The officer who is present apparently did not actually write the report, her partner is the one on medical, however, Mr. Sherman asked Ms. Washington isn't it a fact, based on the contents of that report, that Mrs. Washington told you that she couldn't get a look at the man's face. Mrs. Washington denied that, therefore [defense attorney] laid a foundation for impeachment and he is not attempting to perfect that impeachment.

He indicated to me, prior to this matter going on the record, that he had a conversation with the second officer, the one that did not actually write the report, but the one that was there, when the interview with Mrs. Washington took place and he indicated she doesn't recall what was said. *** Mr. [Defense Attorney], you want a continuance because the other officer that is on the medical is not here.

[Defense Attorney]: *** Here is a case where all I know is I have a police report in my possession, a police report which is unequivocal that says that at no point in time was the victim allowed to see the offender's face.

It's the most damaging type of evidence in a personal identification that I can think of. Now I am saying to you that in talking to the Officer McCoy, who states to me that she did not author this report, that she does not remember the nature of the conversation, that she does not remember the victims saying that, that in order that, since you have allowed them to bring in the testimony of Donita Washington, in order for my client to get a fair trial, I must have Officer Walker come in to show that this woman, Donita Washington, did not get a look at the offender's face and it is so critical, critical not because my client is on trial for the crime of Donita Washington, but as

we said, other crimes which the Court allowed in.

\*\*\* I say to your Honor that in not allowing me to get a continuance to find this officer to impeach that witness is denying my client a fair trial in the most elementary, fundamental way.

THE COURT: All right. It's not a question of whether or not the witness can be located. The officer that you seek to issue is on medical roll, *I don't know when she will be available here.* We are on the final date of the jury trial, if you call the other officer that was present during the interview of Donita Washington, I will afford you an extremely broad latitude in direct examination to ascertain whether or not that is what Ms. Washington said or whether she recalled what she said, but I am not—What is the prognosis of the other officer?

[Assistant State's Attorney]: *I don't even know why she is on medical.* You know when you call what happens.

THE COURT: On the medical roll. You have one of the officers, \*\*\*. I know it's a problem for you and I realize that, but you do have one of the officers that was present. If the other officer was dead that wouldn't, I couldn't give you a continuance, now, could I?

[Defense Attorney]: Now, Judge, we understand if the other officer was dead—

THE COURT: I can only do what is possible and I am not going to continue this matter for that purpose, on that purpose only. You have the other officer and I will afford you an extremely broad latitude.

[Assistant State's Attorney]: We are not stipulating to what is in there.

THE COURT: You interviewed the officer that is available, the officer that co-authored that report?

[Defense Attorney]: I have talked with her. \*\*\* She said she doesn't remember the report, remember the conversation, she didn't remember the victim saying to her, 'at no point in time was the victim allowed to see the offender's face.'

\* \* \*

[Assistant State's Attorney]: She didn't interview the lady.

THE COURT: She co-authored the report.

[Assistant State's Attorney]: Her name is on the report.

[Defense Attorney]: Your Honor, we are talking about fundamental fairness.

THE COURT: I know what you are talking about. You are

also talking about the witness that is unavailable.

[Defense Attorney]: I don't know why, I have no idea why she is unavailable other than they say she is on medical, but this is the most critical, I mean, we are not talking about something peripheral, I am not talking about something that is minor, I am talking about the thing that goes to the very issue, what this case is all about, identity.

Here is a woman that said on four different occasions 'You never forget the face of a man that has a gun.' Now I am showing you that there is a police report written by someone who is at the scene at the time.

THE COURT: All right. Will you stipulate?

[Assistant State's Attorney]: No.

THE COURT: First of all, just a minute. If that officer is on the medical roll would testify, that she would testify that the statement was contained within her report?

[Assistant State's Attorney]: No.

THE COURT: Okay. Based on what I have heard thus far, based on the fact that there is a jury in the jury room, based on the fact that the witness you seek is on medical roll and there is no showing, whatsoever, as to when she would be available or what she would testify to, based upon the fact that you have had knowledge in your possession for quite some time, your request for a continuance is denied. .

[Defense Attorney]: *Then I ask that you allow me, at least, a few minutes for me to try and find out where this officer is,* that the fact that she is on medical maybe we can get her home phone number.

It seems to me, your Honor, the fact that there is a jury in the box is not the ultimate issue in this case. The ultimate issue in asking for a date is the Defendant's right to a fair trial.

\* \* \*

I am telling your Honor you are denying the Defendant a fair trial. This is so damaging, and you realize it yourself, this is a critical thing. We are now talking about the entire issue of this case, which is identification.

Here is a statement by a witness who totally impeaches what she says later. \*\*\*

THE COURT: One further question, Mr. State's Attorney. In the event that he doesn't call the co-author of the report, are you going to move to strike that question and answer perfecting impeachment?

[Assistant State's Attorney]: No, I won't move.

THE COURT: I think that is very kind of you. All right, you can argue it, then. He is not going to strike it. You can argue she told the police, the police report indicates and she couldn't see his face and I will afford you broad latitude in your direct examination.

[Defense Attorney]: Then we better put this woman on to the fact—Well, I want to put her on to say that she and the officer did author a report, that her name is on it, that she read it, that though she doesn't remember the statements made, that this was made by her partner at the time of the event. This is her partner's report and it has a statement in it, and you [assistant State's Attorney] can argue to what Ms. Washington testified to.

[Assistant State's Attorney]: Just on what the law is, Judge, on evidence, you can't do that. It's all hearsay. This is something that she is testifying off of on a police report. She didn't author, she was not part of the conversation, she never heard those words spoken, she doesn't have the ability to testify to this police report.

THE COURT: I agree. *** And I already ruled *I am not going to give you a continuance.* Let me know when you are ready to proceed. *I would like to proceed as soon as possible.*" (Emphasis added.)

The trial court was not informed of why, for what, when, where or for how long the reporting officer had been or would be on medical. Nor was the trial court told that her court appearance would impair her health or in anyway interfere with her being on medical. From all that appears in the record before us, the trial court was not even told that she was unable to appear because she was on medical. The assistant State's Attorney merely told the trial court that, "She is on medical, we couldn't track her down." Just what effort the assistant State's Attorney made to locate her was not disclosed to the trial court. Ordinarily, being on medical requires a police officer to be at home or in a hospital convalescing. At the very least the trial court should have inquired and determined when the officer would or could be available and then, based thereon, determine whether to grant the defense attorney's continuance to produce the officer. There was no reason to unjustly rush to judgment in the case. The offenses were committed on March 14, 1983. The indictment was returned 20 months later, on November 5, 1984. The case had been on the trial call for over a year, from November 30, 1984, to December 9, 1985,

and had been up for trial and continued by agreement 16 times. The jury was selected on December 9, 1985, and testimony was presented on December 10, 11 and 12. It was on the afternoon of Thursday, December 12, that the defense attorney requested a continuance to produce the reporting officer as a witness. There was no justification for the trial court to deny the defense attorney's continuance motion. There was no reason not to have postponed the trial to the next day, Friday, or to over the weekend, Monday, to afford the defense attorney an opportunity to produce the witness to testify on the extremely crucial issue before the jury. Surely the trial court should have granted the defense attorney's request for "a few minutes to try to find out where the officer is *** to get her home phone number." For the trial court to have analogized the instant case and the absent officer being on medical with a "dead witness" was not at all helpful in properly ruling on the defense attorney's continuance request. Even if the officer had been under a defense subpoena, she may not have been available because of her medical condition. Surely, under such circumstances the trial court would have and should have allowed the continuance request.

The trial court's offer to the defense attorney (1) to call the officer who was present at court but who did not write the report and who did not recall even talking to Donita Washington and (2) to allow "broad latitude on direct examination" of her, was a blatant, totally useless gesture to the defense attorney.

I do not agree with the majority's conclusion that because "the testimony was alleged impeaching testimony" (169 Ill. App. 3d at 540) the trial court did not abuse its discretion in denying the defense attorney's request for a continuance to produce the reporting officer and her impeaching testimony. The identification issue was crucial. Washington identified the defendant as her assailant for the first time 20 months after the robbery. Her testimony was extensive. The jury was entitled to know if she initially stated to the officers that she never saw her assailant's face. The defendant had the right to present such testimony, and he should have been given the opportunity to do so.

Nor do I agree with the majority's conclusion that because the defendant knew that Washington would testify, her testimony was no surprise to him. The defense attorney unequivocally and without any contradiction stated that he was taken by surprise by Donita Washington's identification of the defendant as her assailant. The trial court, or the assistant State's Attorney, did not remotely suggest to the contrary. It is inappropriate for this court so to do *ab initio*, particularly

in the absence of any factual basis therefore.

The majority's conclusion that "it does not appear that defendant acted diligently to get the absent witness' impeaching testimony" (169 Ill. App. 3d at 540) contradicts and is unsupported by the record. The defendant was in custody. His attorney properly relied on the assistant State's Attorney's assurances to the court and him that the assistant State's Attorney would produce the witness. Inasmuch as the assistant State's Attorney did not produce the witness, simply because she was on medical and he could not "track her down," surely the defense attorney should have been given the chance to locate and produce her.

For the reasons that I have previously stated, the majority's conclusions that "the witness was unavailable" and "it does not appear that the impeaching testimony would have affected the outcome of the trial" (169 Ill. App. 3d at 540) are clearly erroneous. It is extremely significant that the jury's deliberations continued way into the night of December 12. When called from their deliberations, the forelady informed the trial court that the jury had not reached any verdict. The trial court directed that they continue their deliberations until the arrival of the bus to take them to their lodging for the night. The jury resumed their deliberations the following morning and sent out written questions regarding Donita Washington's testimony. When called into court at lunch time, in response to the trial court's inquiry, the forelady advised the court that the jury had arrived at only two verdicts. The trial judge thereupon gave the jury the *Prim* instruction (*People v. Prim* (1972), 53 Ill. 2d 62), stating:

"Relative to the question that was sent out this morning, you have all the evidence. Rely on your collective memory.

All right. I will now issue an additional instruction to you. The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty as jurors to consult with one another and deliberate with a view to reaching an agreement. If you can do so without violence to individual judgment.

Each of you must decide the case for yourself. But do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it's erroneous. But do not surrender your honest convictions to the weight or affect to the evidence solely because of an opinion of

your fellow jurors or for the mere purpose of returning a verdict.

We are not partisans. You are judges, judges of the facts.

Your sole interest is to ascertain the truth from the evidence in the case. This will be given to you.

You may go back and continue your deliberations. And if you reach any verdicts, you may return those verdicts."

The jury resumed deliberations but the *Prim* instruction was unsuccessful in inducing the jury to arrive at additional verdicts. After pointing out that "the jury has had the case for approximately 26 hours," the trial court terminated the deliberations and called the jury into the courtroom. The trial court stated and inquired, "Ms. Forelady, when you were out here previously, you indicated to me you had reached a verdict on two of the three charges. Is that still your present position? And on the third charge you have not reached a verdict, is that your position?" The Forelady responded, "Right." The trial court received the two verdicts, guilty of the armed robbery of Margaret Hall and Robert Hanley. The jury was unable to reach a verdict on the charge of attempted murder of Robert Hanley.

Based on the foregoing, the majority's conclusion that "it does not appear that the impeaching testimony would have affected the outcome of the trial" (169 Ill. App. 3d at 540) is purely conjectural and clearly ill-founded. Moreover, it is apparent that the assistant State's Attorney thought the impeaching testimony would have affected the outcome of the trial. He refused to stipulate to it.

From the foregoing it is also quite apparent that the trial court's denial of the defendant's request for a postponement to enable him to produce the reporting officer as a witness was arbitrary, capricious and was a flagrant abuse of the trial court's discretion. *People v. Cobb* (1983), 97 Ill. 2d 465.

In *Cobb*, Phyllis Santini was a prosecution witness on the defendants' jury trial for murder and armed robbery. Santini's testimony implicated the defendants in the offenses. The defendants made an offer of proof that Santini admitted to Patricia Usmani that she and three other accomplices, not the defendants, committed the murder-robbery and thereafter sold to one of the defendants a portion of the robbery loot found in that defendant's possession when he was arrested. The trial court refused to allow Usmani to testify to this incriminating admission made by the prosecution witness Santini to Usmani because the proper foundation had not been laid to impeach Santini on her prior inconsistent statement. The defense attorney then sought to recall Santini, who was not in court and had departed for home. In

*Cobb*, unlike in the case at bar, the prosecutor argued that the defense attorney was improperly seeking to delay the trial and asked the trial court to deny the defense attorney's request for a continuance. The prosecutor in the case at bar made no such argument or objection. The trial court ruled in *Cobb*, as the trial court similarly ruled in the case at bar, that Santini could testify if she were present, but refused to grant a continuance to allow the defense attorney to locate and produce her. In *Cobb*, likewise as in the case at bar, "[n]o representation was made that [the witness] could not be called without a lengthy delay." (97 Ill. 2d at 477.) In *Cobb*, again, as in the case at bar, "The court also did not ask the defense how long it would take to procure [the witness]." (97 Ill. 2d at 477.) In *Cobb*, the supreme court held that "the trial court abused its discretion by refusing to allow the defense a reasonable opportunity to locate and recall Santini to perfect a foundation for Usmani's testimony." 97 Ill. 2d at 478-79.

The trial court in *Cobb* also refused to allow Carol Griffen to testify that Santini had told her that she expected to receive a reward in exchange for her testimony on the ground that the defense attorney had not set the time and place of the conversation, even though the defense attorney had asked Santini if she had told Carol Griffen that she expected to receive a reward for testifying, to which Santini negatively responded. The supreme court held that the trial court erred when it excluded Carol Griffen's testimony of Santini's admission to her that Santini expected to receive a reward in exchange for testifying for the prosecution. In reversing the judgments of conviction in *Cobb*, the supreme court cogently stated:

> "We again emphasize *** how important to the concept of justice it is that the defendants be given every opportunity to present testimony to the jury that legitimately may cast doubt on the veracity of [Santini's] testimony." (97 Ill. 2d at 481.)

In the case at bar the defendant should likewise have been given the opportunity to present testimony to the jury that legitimately may have cast doubt on the veracity of Donita Washington's testimony. The trial court flagrantly abused its discretion when it denied the defendant this opportunity.

The inadmissible and incriminating episodes of Michael West elicited by the prosecutor on direct examination of the investigating and arresting officers and on cross-examination of the defendant were a vital and indelible, but improper, influence in the jury's verdicts. The trial court's denial of the defendant's request for a continuance to produce Michael West as a witness was also arbitrary, capricious and another flagrant abuse of the trial court's discretion. Additionally, be-

cause of the inculpating testimony about Michael West and his absence as a witness, the defendant was denied his constitutional right to confront and cross-examine Michael West.

In his opening statement to the jury, after telling the jury about the Donita Washington, Margaret Hall and Robert Hanley offenses, the prosecutor told the jury that shortly after the commission of the offenses these victims were unable to pick out their assailant from lineups. The prosecutor then told the jury:

"And when they had no success with that, eventually the case was suspended, until a while afterwards, almost 18 months, a detective by the name of McWeeny, who had been involved in the initial investigation, got a call from the person who was, what he will tell you, is an informer. He went and talked to the guy, found some things out, and eventually Detective McWeeny began looking for Stanley Howard [defendant]. And after a while Stanley Howard was located and he was arrested."

Detective McWeeny was called as a State's witness. He testified that on March 14, 1983, he was assigned to investigate the Donita Washington and the Margaret Hall-Robert Hanley robberies. He interviewed the victims, had a composite drawing made of the assailant, conducted lineups, interviewed people in the area where the offenses were committed and where Donita Washington's car was ultimately found. McWeeny further testified that he "talked to the street informants trying to find more leads on the case," and "after again speaking with other informants and trying to develop leads, all of which came out to be negative, [he] suspended the case," in April 1983. McWeeny further testified:

"Q. Now, subsequent to that, what was the next thing that developed as far as your investigation?

A. In late October, 1984, I received information from an informant—

[Defense Attorney]: Objection.

THE COURT: Without going into the content of the information, I will overrule the objection.

[Assistant State's Attorney]: Fine, Judge. Were you contacted by an informant?

A. Yes, sir, I was.

Q. Did you go and visit that informant?

A. Yes, I did.

Q. Did you speak with that informant?

A. Yes, I did.

Q. Did you ask him things and did he give you answers?

A. Yes, he did.

Q. As a result of that interview you had with that informant, what was the next thing that happened, or what did you do?

A. I verified the information I learned from the informant.

* * *

Q. After you talked with that person, what was the next thing that you did after you talked to the informant? What did you start doing?

A. I attempted to match up Stanley Howard's appearance with the descriptions that were supplied to me by Donita Washington, Lt. Hanley, and Officer Hall.

Q. Did you obtain a photograph of Stanley Howard?

A. Yes, I did.

Q. Did you obtain a physical description of Stanley Howard?

A. Yes, sir, I did.

Q. After you obtained both of those items what did you next do?

A. I attempted to locate Stanley Howard.

Q. How did you do that?

A. I went to his Grandmother's house on South Prairie, I went to his mother's house on South Loomis, also visited—I also watched a poolhall located—

[Defense Attorney]: Objection. I object to all this testimony.

THE COURT: Overruled. He can answer. Continue, officer.

A. I conducted stakeout's at certain locations where I knew that Stanley Howard frequented.

Q. Were you successful in finding him?

A. No, I was not.

Q. What did you do when you didn't have success immediately?

A. I went back to the informant.

Q. Did you talk again with the informant?

A. Yes, I did.

Q. And after you talked with the informant this second time, what did you do?

A. I gained assistance of a second informant.

Q. And did you talk with that person?

A. Yes, I did.

Q. When you talked to that person did you concentrate your investigation anywhere?

A. Yes, I did.

Q. Where did you go, or what did you do?

A. Went to a house at 8813 South May.

Q. And what did you do in regards to that house at 8813 South May?

A. There was several stakeout's made there, and also the informant was told that if Stanley Howard showed up—

[Defense Attorney): Objection.

THE COURT: Sustained. Stricken, and the jury is instructed to disregard what the informant told him. Ask another question.

[Assistant State's Attorney]: Were any instructions given to the informant?

THE WITNESS: Yes, there was [sic]."

Detective Tony Maslanka, a prosecution witness, testified, over objection, that on November 1, 1984, he and five other officers received information from an informant and they were assigned to proceed to a location on south May Street to apprehend the defendant, and that they did so. Investigator McWeeny related to the jury that on November 1, 1984, he received a telephone call from other detectives that they had Stanley Howard in custody.

This foregoing testimony of investigating officer McWeeny and arresting officer Maslanka about the informant and the defendant's arrest was nothing but a surreptitious ploy to get before the jury irrelevant, prejudicial, inadmissible hearsay testimony, from which the jury was allowed to speculate that unnamed and unidentified persons told the investigating and arresting officers that the defendant was involved in the commission of the Donita Washington and Hanley-Hall offenses, and, based thereon, the officers arrested the defendant. The basis for the officers' arrest of the defendant was not an issue before the jury, as intriguing as such testimony may have been to them. But the mystical informant testimony did not stop there.

Investigating officer McWeeny testified that he went to the police station and had a conversation with the defendant. The defendant denied the robberies. McWeeny then arranged with the robbery victims to view a lineup. McWeeny then further testified:

"Q. After you completed getting all the people for the lineup, did you do anything else?

A. Yes, I did.

Q. What did you do?

A. I went out and got the informant. The original informant.

Q. Why did you do that?

A. Well, because I had planned to speak to Stanley regarding this case, and if there was any discrepancies in any dialogue that we had between each other, and I wanted to be perfectly sure that he was either telling me the truth, or I could talk to the informant if he was lying to me."

McWeeny related that he went out, got the informant, brought him back to the police station and then went in and began another discussion with the defendant:

"Q. How did that conversation go?

A. Well, this time I sat down with Stanley, I told him that I had the people that were the victims were coming in, and the lineups would be held. I also began talking to him about the Police Officers being robbed, and he again denied it. I then—after that, I then started pointed out information that I had learned from the informant to Stanley, telling him things about the case—

[Defense Attorney]: I'm going to object to this conversation, your Honor.

THE COURT: Well, so far your objection is overruled.

\* \* \*

Q. Did you specifically tell him things that the informant had told you?

A. Yes, sir.

Q. Did you—is this the first time that you confronted him with the fact that you had an informant telling you things?

A. That's correct.

Q. After you confronted him with those things that the informant had told you, about him, what did you do? Or what did he say?

A. He said that he would talk to me about the Police Officers.

Q. And did he begin telling you about the Police Officers?

A. Yes, he did."

McWeeny then stated to the jury that the defendant confessed to him, and he detailed to the jury the defendant's confession to him of the Margaret Hall-Robert Hanley and the Donita Washington robberies. McWeeny admitted on cross-examination, however, that he never confronted the defendant with the informant and that he never reduced the defendant's confession to him to writing.

Investigator McWeeny's foregoing testimony about his conversations with an informant and McWeeny's accusatory confrontations of

the defendant with the McWeeny-informant conversations were, again, nothing but inadmissible evidence spuriously presenting to the jury that the defendant confessed the commission of the offenses to an unidentified informant, who, in turn, told Investigator McWeeny of the defendant's confession to him. The prosecutor did not call the informant as a witness. The defendant was thereby denied his constitutional rights to confront and cross-examine him and to due process, guaranteed the defendant under the sixth and fourteenth amendments to the Constitution of the United States and article 1, sections 2 and 8, of the Constitution of the State of Illinois. This deplorable tactic of presenting such inadmissible incriminating hearsay testimony to a jury and this despicable violation of the defendant's constitutional rights to confront and cross-examine a witness and to due process of law should be resoundingly condemned by this court as it was so condemned by the Supreme Court of the United States in *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056.

In *Lee*, Millie Lee and her boyfriend, Edwin Thomas, were tried by the court for a double homicide. They both confessed and their separate confessions were admitted as evidence at their joint trial. The trial judge relied on Lee's confession in finding her guilty, but he also relied on Thomas' confession, which implicated Lee in the homicides, in finding Lee guilty. The Supreme Court stated that, "The question for decision is whether such reliance by the judge upon the codefendant's confessions violated [Lee's] rights as secured by the Confrontation Clause of the Sixth Amendment, as applied to the States through the Fourteenth Amendment."

In the case at bar, the record does not disclose whether the informant to whom the defendant purportedly confessed was an accomplice of the defendant. In any event, that distinction is totally irrelevant. In the case at bar, as in *Lee*, the factfinder, in finding the defendant guilty, relied on an out-of-court declaration by a third party who was not called as a witness, which declaration implicated the defendant in the commission of the crimes. In reversing the judgment of conviction in *Lee*, the Supreme Court held:

"In *Pointer v. Texas* [(1965),] 380 U.S. 400, [13 L. Ed. 2d 923, 85 S. Ct. 1065] this Court unanimously held that the Confrontation Clause was applicable to the States, and in doing so, remarked that it 'cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him.' [Citation.] *** [Citations.] *** 'There are few subjects, perhaps, upon which this Court and other courts have been

more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.' *Pointer, supra,* at 405[, 13 L. Ed. 2d at 927, 85 S. Ct. at 1068].

On one level, the right to confront and cross-examine adverse witnesses contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails. To foster such a system, the Constitution provides certain safeguards to promote to the greatest possible degree society's interest in having the accused and accuser engage in an open and even contest in a public trial. The Confrontation Clause advances these goals by ensuring that convictions will not be based on the charges of unseen and unknown—and hence unchallengeable—individuals.

But the confrontation guarantee serves not only symbolic goals. The right to confront and to cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials. In *California v. Green* [(1970),] 399 US 149, 158, [26 L. Ed. 2d 489, 497, 90 S. Ct. 1930, 1935,] we identified how the mechanisms of confrontation and cross-examination advance the pursuit of truth in criminal trials. Confrontation, we noted,

'(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility.' *Ibid.*

Our cases recognize that this truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination. As has been noted, such a confession 'is hearsay, subject to all the dangers of inaccuracy which characterizes hearsay generally * * *.' " 476 U.S. at 539-41, 90 L. Ed. 2d at 525-26, 106 S. Ct. 2061-62.

As in *Lee,* in the case at bar McWeeny's testimony of his conversations with his informant and McWeeny's accusatory confrontation of the defendant thereon in the absence of the informant as a witness

likewise violated the defendant's constitutional rights to confrontation, cross-examination and due process, and his judgment of conviction should also therefore be reversed.

When the prosecutor disclosed through cross-examination of the defendant that the defendant knew Michael West and through the direct examination of Investigator McWeeny that Michael West was McWeeny's informant, the trial court should have allowed the defense attorney's request for an opportunity for the defendant to produce Michael West as a witness. The trial court's refusal to do so was obstinate and was a clear abuse of its discretion.

The defendant testified in his own behalf. He stated that he could not remember where he was on March 13 and 14, 1983, two years and eight months previously. He denied that he committed the offenses and denied that he made any statements or admissions to Detective McWeeny. The prosecutor questioned the defendant and he testified on cross-examination, *inter alia*, as follows:

"Q. Your girl friend's name, her last name is West; isn't it?

A. Correct.

Q. What's her first name?

A. Mabel.

Q. Mabel West. She has a sister, doesn't she, named Denise West?

A. Yes.

Q. And they live at 88th and May; right?

A. Yes.

Q. She has a brother named Michael West, too, doesn't she?

A. Yes.

Q. You know Michael West, don't you?

A. Correct.

Q. Talk to Michael West a lot?

A. No, I haven't talked to him since—two years, now.

Q. Did you talk to Michael West after March 13th and March 14th of 1983?

A. Yes.

Q. Did you ever talk to him about the armed robbery of Lt. Hanley and Margaret Hall?

A. I couldn't talk to him about an armed robbery because I wasn't involved. And I didn't know nothing about it.

Q. So your answer is no?

A. Correct.

\* \* \*

Q. Let's talk about what Detective McWeeny and you talked

about, okay? When Detective McWeeny came in there, the second day, and he came up to you and he asked you what you know about it, you said you didn't know nothing; isn't that right?

A. Yes.

Q. And then Detective McWeeny began to tell you what the informant had told him, didn't he?

A. Yes.

Q. He did?

A. Un-huh.

Q. And you know who that informant is, don't you?

A. I wish I did.

\* \* \*

Q. You don't know who it is?

A. No, sir.

\* \* \*

Q. Detective McWeeny told you that the informant had told him things about the armed robbery of Lt. Hanley, didn't he?

A. He said that he knew someone that knew something about it.

Q. And what he was talking about was what that informant had told him, and he was telling that to you, asking you if you knew about it, wasn't he?

\* \* \*

A. I don't know; I think so.

Q. Didn't he tell you that the informant told him that the man that was robbed in the car kept reaching down underneath his seat, trying to get something? Didn't McWeeny tell you the informant told him that?

A. Well, practically McWeeny told me a lot about the case, like he was there himself or like someone had told him this.

Q. Or like someone had told an informant about the case; right, Mr. Howard?

A. I think so. I don't know.

Q. Did Mr. McWeeny tell you that the man that did the robbery liked to wear rubberband around his head and then put a stocking hat on so the hat wouldn't fall off when he ran? Did he tell you that.

A. No.

Q. Did he tell you that the person that did the robbery left the car at 135th and Kedzie and then went over to 134th and Woodlawn, to his girl friend's house? Did he tell you that that's

what the informant told him?

A. No. No.

Q. Did he tell you the informant told him that the man that did the robbery took the Police stars when he found out that they were Police stars, threw them out because he didn't want problems? Did he tell you that?

A. Yes.

Q. What did you say when he told you these things?

A. Well, Detective McWeeny made a lot of crazy accusations that I just couldn't understand.

Q. Tell us some of the crazy accusations that he said the informant had told him that brought you into the station.

A. That I done it, and that's way out of the question.

Q. Didn't he tell you how the informant said you did it?

A. He called himself explaining to me that the informant said that I done it.

Q. That's all?

A. Yeah.

Q. Didn't he give you a few facts that the informant gave?

A. Un-huh.

Q. Tell the ladies and gentlemen of the jury what those were.

A. Well, it's been about a year and two, three months now. I can't really recall what he said.

\* \* \*

Q. You never talked with Michael West about the robbery of Robert Hanley and Margaret Hall?

A. No.

Q. Even though he is your friend?

A. No.

\* \* \*

Q. Michael West is the brother of Mabel West or Inez West, who you have a son by, isn't that true?

A. Correct.

Q. And he lives about two blocks from you; isn't that right?

A. No.

Q. Over at 88th and May?

A. Six, seven blocks."

By far the greater portion of the prosecutor's cross-examination of the defendant was on the "informant," McWeeny's conversation with the defendant about the informant and on Michael West. The prosecutor established by this cross-examination of the defendant that

the informant told Investigator McWeeny that the defendant was involved in the commission of the alleged offenses and that the defendant had told the informant of his involvement. This cross-examination testimony was also rank inadmissible, incriminating hearsay.

Following the defendant's testimony, Detective McWeeny was called by the State as a rebuttal witness. He testified, over the defendant's objections:

"Q. You talked yesterday and told the ladies and gentlemen of the jury about a conversation you had with a person at Area 2 on November 2nd and a prior conversation with him and you referred to that person as an informant. Do you remember that?

A. Yes, sir.

\* \* \*

Q. What is the name of that person that you had that conversation with before you began gathering that information about Stanley Howard?

A. Michael West.

Q. And do you know where Michael West is now?

A. I have no idea where he is at.

Q. Is he in Illinois or do you know where he is?

A. He is living in the City of Chicago.

Q. Do you know where?

A. Not exactly."

Sergeant Jamie L. Ganison of the Robbins, Illinois, police department was also called by the State as a rebuttal witness. He testified that he was familiar with the Cook County housing projects at 134th and Woodlawn, and that in 1983 and 1984 the West family resided there. The purpose of this testimony is unclear, other than to show the jury that the West family lived in government subsidized housing.

The record discloses that Michael West's mother was in the courtroom during the trial. The following colloquy occurred:

"[Defense Attorney]: Surrebuttal. I need—*I am going to ask for a continuance to bring in Michael West.*

THE COURT: You know where is he?

[Defense Attorney]: I am going to try to find him. This is the first knowledge I have had that Michael West was the informant. I should be allowed to see if I can find this Michael West to rebut the testimony that, in fact, he never stated to these police officers that, in fact, my client was involved in the crime.

THE COURT: Do you know where Michael West is?

[Defense Attorney]: I think so.

\* \* \*

THE COURT: Is your information based on something your client told you?

[Defense Attorney]: Based on something Michael West's mother told me.

THE COURT: He is not available today? Where is he?

[Defense Attorney]: Right now? I don't know, I will find out.

THE COURT: This is prior to final argument, very untimely.

[Defense Attorney]: Untimely because its not come up, there is no list of witnesses saying Michael West. We have never said, no one has ever said—

THE COURT: You want to call him as your witness, Counsel?

[Defense Attorney]: Certainly, my witness to testify that he did not give any statements to the police, that he did not say to Det. McWeeny that Stanley Howard committed this crime.

[Assistant State's Attorney]: Have you talked to him? Do you have good faith belief that is what he is going to say?

[Defense Attorney]: Yes.

THE COURT: When did you talk to him?

[Defense Attorney]: I talked to his mother.

[Assistant State's Attorney]: If he knows, his mother has been here, he has been in conference with Michael West's mother, she has been here during the whole trial.

THE COURT: Do you know exactly where he is right now?

[Defense Attorney]: If you give me a few minutes and let me talk to his mother—

THE COURT: How long will it take you?

[Defense Attorney]: I don't know. I have to talk right now to his mother. You have to understand, they just put his name and tied him up as being the informant just a minute ago on the stand. That is the first contact we have had showing that he is exactly the informant they used.

THE COURT: Give me an offer of proof what he would say?

[Defense Attorney]: Can I tell you what my offer of proof is?

THE COURT: He would deny he made those allegations?

[Defense Attorney]: yes.

THE COURT: That will be cross examined by the State,

isn't it a fact you told Officer McWeeny this and Officer McWeeny this and he will verify what Michael West said to him.

[Defense Attorney]: Fine.

THE COURT: I presume knowing that, you still persist?

[Defense Attorney]: Yes. Without Michael West here it's certainly an inference against my client.

THE COURT: When did you first learn that Michael West was *** involved in this case?

[Defense Attorney]: Yesterday when they testified, when Michael West's name was mentioned.

THE COURT: What steps have you taken to find out where he is at since then?

[Defense Attorney]: I took no steps for the reason I had no, I expected that the State was going to bring in Michael West in rebuttal because, in fact, they had brought out what I thought was prejudicial testimony and that without bringing Michael West here to verify that, it seemed to me that there was no way they could prove it. My client doesn't know who told, had these police arrest him.

THE COURT: Any arrest?

[Assistant State's Attorney]: *** Mrs. West, the Defendant's girl friend, Michael West's sister have been in Court since Monday. I have seen Counsel talking to them every day.

[Defense Attorney]: Absolutely, but what has that to do with Michael West? If someone can show me in any of the police reports where I would know that Michael West—

THE COURT: It's your witness.

[Defense Attorney]: I didn't know Michael West is the informant. These people didn't know Michael West was an informant. It's the first knowledge that we have had that Michael West is the informant.

THE COURT: Yesterday?

[Defense Attorney]: No, today. Yesterday his name was mentioned, yesterday his name was mentioned and they asked him, but it was only today when that Officer testified that said he was the informant. Now it seems to me if they are going to use this man, they certainly had a right to give me notice. This is not a card game, this is not poker, this is not you hold your cards back.

THE COURT: What do you mean, using this man?

[Defense Attorney]: Because using this man, they are show-

ing without bringing this man in that, one, he was an informant, two, that he knows my client, that he certainly was privy to any conversations. It certainly is very condemning towards my client in the fact that I have had no knowledge of the fact, that there is no discovery, \*\*\*. *I am asking for a continuance to bring in Michael West \*\*\* have it done today.*

THE COURT: Do the police reports that were tendered to Counsel, pursuant to discovery, contain the information that Officer McWeeny told about an informant and pursuant to that went and started concentrating his investigation on the Defendant.

[Assistant State's Attorney]: Absolutely.

THE COURT: Based on what I heard so far, the motion for a continuance is denied. Secondly, on my own motion, since I didn't hear anyone else make it, I am going to strike any question that [the assistant State's Attorney] asked yesterday which incorporated a statement of this Michael West to the Defendant and it will be stricken from the record and I will caution the Jury to disregard it on my own motion.

[Assistant State's Attorney]: As long as the Jury understands when the Defendant admitted Michael West was his friend—

THE COURT: That will not be stricken. Any statement that you incorporate in your question about Michael West told the Defendant will be stricken.

[Defense Attorney]: Obviously it doesn't cure the record, it poisons the Jury." (Emphasis added.)

Similar to the prosecutor's meager representations to the trial court that the reporting officer, who interviewed and reported that Donita Washington stated that she never saw the face of her robber, was on "medical" and could not be contacted, Officer McWeeny likewise testified that he did not "exactly" know where Michael West was, although he knew he was living in Chicago. It appears from the foregoing and the record before us, however, that the defendant's attorney may not have had any difficulty in locating and producing Michael West as a witness. The trial court made absolutely no attempt to ascertain what efforts McWeeny and the prosecutor had made to locate West and the prosecutor made no request for any time to produce him as a witness. The trial court did not even ask defense counsel how long a delay he sought in order to produce West. The trial court's denial of the defense attorney's request for a delay to produce West was just as capricious and arbitrary as the trial court's denial of

his request for a delay to produce the police officer, and to that extent the trial court was devastatingly, but erroneously, consistent.

In view of the voluminous incriminating testimony against the defendant about Michael West, the trial court plainly erred and abused its discretion when it denied the defense attorney's request for a continuance to produce Michael West as a witness. The incriminating testimony about the defendant *vis-a-vis* Michael West in the absence of Michael West being called as a witness denied the defendant his constitutional rights to due process, confrontation, and cross-examination under the sixth and fourteenth amendments to the Constitution of the United States and article 1, sections 2 and 8, of the Constitution of the State of Illinois. *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056; *People v. Lott* (1977), 66 Ill. 2d 290.

In *Lott*, the defendant was charged with the commission of a gasoline station robbery. At trial the defendant and three alibi witnesses testified that the defendant was at a party at the time the robbery was committed. As a rebuttal witness, the prosecutor presented Richard Nitz, a county jail inmate, who testified that the defendant admitted to him and several other jail inmates that he had committed the robbery. The defense attorney, out of the presence of the jury, stated to the trial court that he was surprised by Nitz' testimony and requested a continuance to produce the persons as witnesses to whom Nitz claimed the defendant made the admissions. The circumstances and chronology in *Lott* are literally identical to the circumstances and chronology in the case at bar. In *Lott*, "the defense proffered its intention, 'in light of the surprises,' to find out who the witnesses to the admission were and to call them for rebuttal. The court advised that the motion would be denied. *The defense stated that it then would move for a mistrial on the grounds that defendant was denied his only possibility to rebut* the additional accusations, extremely prejudicial to him, and that he was denied a fair trial. The motion was denied. The defense moved formally for a continuance to ascertain the surrebuttal witnesses. The motion was denied. The defense then objected again, this time on sixth amendment grounds. Defense counsel reiterated the surprise circumstances and his lack of necessary information for rebuttal. Defendant then took the stand again and denied making the admission." (Emphasis added.) (66 Ill. 2d at 294.) The jury found Lott guilty of the commission of the armed robbery. On appeal, the supreme court pointed out, "The Appellate Court for the Third District reversed the conviction, ruling that the denial of the motion for [a] continuance unduly restricted the defendant's opportunity to

present surrebuttal testimony in respect to a motion which was critical to the issue of guilt. 33 Ill. App. 3d 799." (66 Ill. 2d at 293.) In reversing the defendant's conviction (and affirming the appellate court), the supreme court held in *Lott*:

> "The circumstances of this case evidence that the testimony of the State rebuttal witness, Nitz, stating that the defendant had admitted the crime to him and to others, was totally unexpected by the defense counsel. \* \* \*
> \* \* \*
>
> In this case, where counsel neither knew of nor was given the opportunity to investigate the circumstances of the incriminating testimony that the defendant admitted the crime to people in the jail, there was even a greater risk of unfair prejudice and confusion of the issues in the minds of the jurors. The probative value of the surprise testimony was substantial. The defense objected and was then denied a continuance to search out evidence and witnesses to contradict the testimony in the minds of the jurors. Defense counsel informed the court that he was unprepared as to the testimony, and he sought discovery from the State on the matter and a continuance. The court denied both. Unlike the counsel in *Kuczynski*, who had been knowledgeable of the fact that the witnesses were testifying and of the circumstances of the evidence at the preliminary hearing, the defense here was totally unaware of the circumstances brought out by the testimony and was unprepared for this development in the case. As such, he could not buttress his request for a continuance by citing concrete information as to the availability of other means of proof he could obtain for rebuttal.
>
> We have determined from the trial record that the denial of a continuance, on the grounds of surprise, to procure surrebuttal witnesses prejudiced the accused's opportunity to adequately defend." (66 Ill. 2d at 297-98, 300.)

Likewise, in the case at bar the denial of the defense attorney's request for a continuance to produce Michael West prejudiced the defendant's opportunity to adequately defend and his conviction should likewise be reversed and the cause should be remanded for a new trial.

In the case at bar, the trial court's stated basis for denial of the continuance motion was utterly fallacious, *i.e.*, that "the police reports that were tendered to counsel pursuant to discovery contain the information that Officer McWeeny told about an informant and pursu-

ant to that went and started conducting his investigation on the defendant." The defendant would have absolutely no way of knowing from that meager information in the police reports who the informant was in order to interview him, or what information the informant had given Detective McWeeny, or that the prosecutor would be erroneously allowed to present this inadmissible hearsay as substantive evidence to the jury to convict him.

The prosecutor not only told the jury about Michael West in his opening statement to the jury, he also argued the witnesses' testimony about Michael West to the jury, as follows:

> "We heard from Detective McWeeny who suspended the case, he said we don't have any leads, we don't have any new information, the case is on the back burners. And then somebody came to McWeeny, McWeeny did not go to find somebody, McWeeny didn't have a bone to pick, somebody came to McWeeny and said I know things about that that have been going down, I know about some of them and he gained some information and they went and got him \* \* \*."

The trial court's instruction to the jury to disregard the Michael West testimony was likewise specious and meaningless. The trial court stated:

> "Ladies and Gentlemen, you heard certain questions put to the *Defendant* by [the assistant State's Attorney] which included statements allegedly made by a Michael West. Those statements and those questions containing those statements are stricken from the record. You are instructed to disregard those statements as if they were never said, okay?" (Emphasis added.)

Firstly, this meager instruction told the jury to disregard the questions and answers only of the *defendant* about Michael West, when, by far, the greater portion of the capacious incriminating testimony about Michael West was elicited from Officers McWeeny, Jamie Ganison and Tony Maslanka, the State's witnesses. The majority's assertion that "[t]he court did strike the testimony of West from the record and admonished the jury to disregard *all questions and statements by the People which incorporated alleged statements of West*" (emphasis added) (169 Ill. App. 3d at 540) is clearly erroneous. Secondly, the testimony about Michael West was by far too voluminous, too intricate, too intriguing, too detailed and too incriminating for the jury to disregard it and be totally uninfluenced by it which, obviously, were the reasons the prosecutor so meticulously elicited it. Thirdly, "When Jurors Are Ordered to Ignore Testimony, They Ignore the Or-

der" (Allen, *When Jurors are Ordered to Ignore Testimony, They Ignore the Order*, Wall St. J., Jan. 25, 1988, at 1, sec. 33) staff reporter Michael Allen states, "The bottom line is, most jurors, because they are human beings, find it difficult to ignore what they consider important."

The language of the supreme court in *People v. Hernandez* (1988), 121 Ill. 2d 293, on a jury's inability to ignore prejudicial testimony that it has heard pursuant to a mere oral direction from the trial court is most applicable here. In the case at bar, it was the defendant's prejudicial cross-examination testimony about Michael West, a nontestifying purported informer, that the jury was meekly told by the trial judge to disregard. In the case at bar, the jury was not admonished to disregard the inadmissible incriminating testimony of Officers McWeeny, Maslanka and Ganison of admissions to them by the nontestifying purported informer, Michael West, which inculpated the defendant in the commission of the offenses. Similarly, in *Hernandez*, during their jury trial, it was the officers' inadmissible testimony of admissions to them by the nontestifying codefendant, Cruz, which inextricably inculpated the defendant Hernandez in the commission of the offenses, on which the defendant Hernandez relied for reversal of his murder, rape, etc., convictions. In reversing Hernandez' conviction, on that ground, the supreme court significantly pointed out:

> " 'It would be difficult to imagine any evidence that would be more prejudicial' than inculpation of the defendant by a nontestifying codefendant [informant]. [Citation.] To suggest that the jury disregard such explosive evidence is, in the words of Judge Learned Hand, a 'recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else.' [Citations.] ('we cannot accept limiting instructions as an adequate substitute for [the] constitutional rights of cross-examination'); [citation] ('The naive assumption that prejudicial effects can be overcome by instructions to the jury *** all practicing lawyers know to be unmitigated fiction').) Likewise, the trial court's ruling to strike *** could not undo the damage already done; as this court has previously warned, 'it is practically impossible for the average juror to divest his mind of such testimony.' *People v. Bolton* (1930), 339 Ill. 225, 229-30." 121 Ill. 2d at 318.

In the case at bar it was likewise impossible for the jurors to divest their minds of the inadmissible incriminating hearsay testimony about the purported informer, Michael West, and this defendant's conviction should therefore be likewise reversed.

I have quoted herein extensive verbatim testimony and excerpts of the trial proceedings because it demonstrates the extent to which the defendant was denied fundamental fairness and because it unequivocally establishes that the jury's guilty verdicts are irreparably tarnished and lack integrity. A drastic 28 years' imprisonment sentence on this 23-year-old defendant, whose only prior criminal record was a plea of guilty to petty theft for which he was sentenced to two days considered served and one year's conditional discharge, should not have been imposed on the impure, polluted guilty verdicts in the case at bar. The trial proceedings reek with reversible error and flagrant violations of fundamental fairness. The defendant is entitled to a new trial.